# JEFFERIS *v.* EAST OMAHA LAND CO.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEBRASKA.

No. 1539. Submitted January 13, 1890. — Decided March 10, 1890.

A fractional section of land, on the left bank of the Missouri River, in Iowa, was surveyed by United States surveyors in 1851, and lot 4 therein was formed, and so designated on the plat filed, and as containing 37.24 acres, the north boundary of it being on the Missouri River. In 1853 the lot was entered and paid for, and was patented in June, 1855, as lot 4. Afterwards, by ten mesne conveyances, made down to 1888, the lot was conveyed as lot 4, and became vested in the plaintiff. About 1853 new land was formed against the north line, and continued to form until 1870, so that then more than 40 acres had been formed by accretion by natural causes and imperceptible degrees within the lines running north and south on the east and west of the lot, and the course of the river ran far north of the original meander line. The defendant claimed to own a part of the new land by deed from one who had entered upon it. The plaintiff filed a bill to establish his title to the new land, claiming it as a part of lot 4. On demurrer to the bill; *Held,*

(1) The bill alleging that the land was formed by " imperceptible de-

grees," the time during which the large increase was made being nearly 20 years, the averment must stand, notwithstanding the character of the river, and the rapid changes constantly going on in its banks;

(2) Where a water line is the boundary of a given lot, that line, no matter how it shifts, remains the boundary; and a deed describing the lot by its number conveys the land up to such shifting water line; so that, in the view of accretion, the water line, if named as the boundary, continues to be the boundary, and a deed of the lot carries all the land up to the water line;

(3) Accretion is an addition to land coterminous with the water, which is formed so slowly that its progress cannot be perceived, and does not admit of the view, that, in order to be accretion, the formation must be one not discernible by comparison at two distinct periods of time;

(4) The patent having conveyed the lot as lot 4, and the successive deeds thereafter having conveyed it by the same description, the patent and the deeds covered the successive accretions, and neither the United States, nor any grantor, retained any interest in any of the accretion;

(5) Where a plat is referred to in a deed as containing a description of land, the courses, distances and other particulars appearing upon the plat are to be as much regarded, in ascertaining the true description of the land and the intent of the parties, as if they had been expressly enumerated in the deed.

THIS was a suit in equity, brought in the Circuit Court of the United States for the District of Nebraska, on the 9th of February, 1889, by The East Omaha Land Company, a Nebraska corporation, against Thomas Jefferis. The case was heard on a demurrer to the bill, which makes it necessary to state with particularity the allegations of the bill. They are as follows:

The lands which are the subject of the suit are of the value of $2000 or more. In 1851 the deputy surveyors of the United States, then engaged in surveying the public lands in township 75 north, range 44 west, of the fifth principal meridian, in the State of Iowa, ran, marked and made field-notes and plats of the meander line of the left bank of the Missouri River, and returned the said field-notes and plats to the surveyor general of Iowa, who filed the same in the General Land Office, and they were thereupon duly approved; and since that time no resurvey has been made by the United

States of the lands lying along, upon, or near said river, or of the premises which are the subject of the bill.

Section 21 in that township was properly surveyed and subdivided by the deputy surveyors, and the plats and notes thereof were duly made, returned and approved as aforesaid. By the surveys the section was found, and by the plats and notes thereof returned as fractional; and a part thereof, designated as lot 4, was formed, containing 37.24 acres, the north boundary thereof being on the Missouri River. The meander line of the river was described in the field-notes as beginning at meander corner No. 6, the same being at a point on the line between sections 16 and 17 in said township and range, about 100 feet north of the intersection of the exterior lines of said sections 16 and 17 and sections 20 and 21; thence south 71 degrees east, 2.68 chains to meander post No. 7, on the north line of lot 4; thence south 79 degrees 50 minutes east, 54 chains; thence north 85 degrees east, 4.50 chains; thence east 15 chains; thence north 87 degrees east, 5.25 chains to the corner of sections 21 and 22. A map was annexed, marked Exhibit A, being a true copy of the plat so made, returned and approved, showing the meander line of the river and the lines of the subdivisions of sections 16, 17, 21 and 22.

On the 10th of October, 1853, one Edmund Jefferis entered lot 4 at the United States Land Office for the district of land subject to sale at Kanesville, Iowa, paid the proper officer of the office the legal price thereof, and received therefor the usual register's certificate; and, on the 15th of June, 1855, the usual patent of the government was duly issued to him for the land. In the certificate and patent the land was described as lot 4 in fractional section 21, in township 75 north, range 44 west, of the fifth principal meridian, containing 37.24 acres, according to the official plat of the survey of the land returned to the General Land Office by the surveyor general. At the time of the entry, the meander line of the left bank of the river was the same, or nearly the same, as shown by such field-notes and plat.

On the 14th of July, 1856, said Jefferis duly conveyed the

land to Joseph Still and Joseph I. Town, describing the same simply as lot 4, in section 21, in township 75 north, range 44 west, of the fifth principal meridian. On the 21st of September, 1857, Town conveyed the undivided half of the premises, with warranty, to one McCoid, who, on the 16th of October, 1857, quit-claimed the premises to one Coleman. On the 25th of May, 1858, Coleman conveyed them, with warranty, to Mrs. Ruth A. Town. On the 27th of April, 1859, Joseph I. Town and Ruth A. Town conveyed them, with warranty, to one Boin, who, on the 30th of May, 1861, quit-claimed them to one McBride; and McBride, on the 30th of September, 1861, quit-claimed them to one Schoville. Schoville having died, his widow and heirs quit-claimed them to the plaintiff, on the 22d of March, 1888. On the 9th of March, 1888, Still quit-claimed the other undivided half of the premises to Lyman H. Town, who, on the 28th of March, 1888, conveyed the same to the plaintiff. In each of the deeds made by those several parties, the premises were described as lot 4 in fractional section 21, township 75 north, range 44 west, of the fifth principal meridian, and the deeds were duly recorded in the registry of Pottawattamie County, Iowa, in which county the premises were situated.

About the time of the original entry of lot 4 by Edmund Jefferis, new land was formed along and against the whole length of the north line thereof, and from that time continued to form until 1870, so that in that year, at a distance of 20 chains and more from the original meander line before described, and within the lines of the lot on the east and west running north and south, a tract of 40 acres and more had been formed by accretion to the lot, and ever since had been and now is a part thereof. The said land was so formed by natural causes and imperceptible degrees, that is to say, by the operation of the current and waters of the river, washing and depositing earth, sand, and other material against and upon the north line of the lot; and the waters and current of the river receded therefrom, so that the new land so formed became high and dry above the usual high-water mark, and the river made for itself its main course far north of the original meander line.

Such process, begun in 1853 and continued until 1870, went on so slowly that it could not be observed in its progress; but, at intervals of not less than three or four months, it could be discerned by the eye that additions greater or less had been made to the shore.

In 1877, the river, at a point more than a mile south of the north line of the lot, suddenly cut through its bank and made for itself a course through the same, leaving all of section 21 north of its bank. A plat, marked Exhibit B, was annexed, upon which was delineated the river both before and after such sudden change.

The river was and always had been navigable for steamers of large tonnage. The United States never claimed any interest in the land so formed by accretion to lot 4. The plaintiff submitted that by such several mesne conveyances, whereby the title to lot 4 had come to it, it had become seized in fee, not only of the land included within the boundaries of the lot at the time of such survey, but also of the land so formed by accretion thereto, so that the east and west boundaries of the lot were formed by the protraction of the east and west lines north to the left bank of the river, as the same was in 1877 when the river suddenly changed its course, and the north boundary of the lot was the said left bank at that time.

When the plaintiff became seized of the land, it entered into the same and made large and valuable improvements thereon; and it had projected the enterprise of redeeming the land and other land adjoining it, of improving the same so that the whole would be available for railroad and manufacturing purposes, of building railroad tracks, station-houses, depots, warehouses, and manufacturing establishments, and selling parcels of the land to others for such purposes, and had expended more than $20,000, and had in hand $100,000 which it purposed to expend in grading, and in building roads, bridges, etc.

In 1888 one Counzeman and others, without any authority of law, entered upon the land so formed by accretion, and for a time occupied it, but afterwards abandoned it. Recently, Counzeman had made to the defendant a deed of quit-claim

purporting to convey a certain parcel of the land so formed by accretion to lot 4. The south line of the land so conveyed to the defendant was about two hundred feet north of the original meander line of lot 4, as that line was so run, marked, and platted by the United States surveyors; and the deed purported to convey about twenty acres, which were within the above-recited boundaries of the land formed by accretion to lot 4. When Counzeman entered upon the land and when he made the deed to the defendant, each of them well knew of the plaintiff's plan and purposes in respect thereof, and that they had no right so to enter; and the defendant threatened to, and, unless restrained by injunction, would, dispossess the plaintiff and seriously interfere with its plans and purposes. The defendant was insolvent and unable to answer for the damage to which he would subject the plaintiff by entering into the premises and dispossessing the plaintiff.

The bill waived an answer on oath, and prayed for an injunction restraining the defendant from entering into, taking possession of, or intermeddling with, any part of the premises conveyed to him by Counzeman, and for a decree declaring that the land so formed against lot 4, including that conveyed to the defendant, became and was a part of lot 4 and included within its description; that the title to it had become and was vested in the plaintiff; that the deed made to the defendant be delivered up to be cancelled; that he be perpetually enjoined from asserting the same or any title or interest thereunder against the plaintiff; and for general relief.

The defendant interposed a general demurrer to the bill, for want of equity.

The case was heard before Mr. Justice Brewer, then Circuit Judge, who filed an opinion on the 1st of March, 1889, directing that the demurrer be sustained. 40 Fed. Rep. 386. On a petition for a rehearing, which was heard by the same judge, he filed an opinion, 40. Fed. Rep. 390, directing that the demurrer be overruled. Thereupon a decree was entered, on the 13th of November, 1889, overruling the demurrer; granting a perpetual injunction restraining the defendant from entering into, taking possession of, or in any manner

intermeddling with, the premises, and from asserting any right or interest therein; and declaring that the land in question was formed by process of accretion and imperceptible degrees against the premises known and described as lot 4 of section 21 in township 75 north, of range 44 west, of the fifth principal meridian, in the State of Iowa, as the same was originally surveyed and platted by the surveyors of the United States, and became, by such accretion, a part of said lot and was included within such description, and the title thereto passed by such description from the original patentee of the United States to the plaintiff, by divers mesne conveyances, and is now vested in the plaintiff. It was further decreed, that the deed made to the defendant by Counzeman, purporting to convey the premises, be delivered up to the plaintiff, to be cancelled, and that the plaintiff recover its costs to be taxed. The premises upon which the decree operated were described in it as follows: Beginning at a point 1520 feet north of the southwest corner of lot 4 in section 21, township 75 north, range 44 west, of the fifth principal meridian, running thence north 660 feet; thence east 1320 feet, to the extension due north of the east boundary line of said lot 4, as originally surveyed and platted by the United States; thence south on that line 660 feet; and thence west to the place of beginning; containing 20 acres. The decree further stated that the defendant prayed an appeal to this court, and that it was allowed.

*Mr. Finley Burke* for appellant.

I. The allegations of the bill taken in conjunction with the known character of the Missouri River, and its bed, enable us to deny that the new-formed lands are accretions. The appellant does not wish to be understood as assuming that the court will take judicial notice of the character of the particular lands in question: only that it will take judicial notice of the characteristics of the Missouri River. *United States* v. *Lawton,* 5 How. 10, 26; *Peyroux* v. *Howard,* 7 Pet. 324.

The facts in relation to this river are matter of common knowledge. They are shown in public documents; in the

reports of surveys and soundings made by government authority and even in the works on geography used in the public schools. They are also shown by reference to histories and works of travel and description. They are within the knowledge of all persons living in this region. But, waiving for the present the common and general knowledge of these matters, the bill itself supplies us with such information as is needed for our present purpose.

It appears that between 1851 and 1877 the river moved north a distance of one mile. It is said that this was done so slowly as to be imperceptible at any one time. Then suddenly it cut through its banks at a point some miles south but yet further up the river as it then existed and left its old bed and courses and made for itself a new one at this great distance.

These allegations show that this river is one, the changes in whose channel are frequent, rapid and very great. Its course is tortuous, and it flows through a wide valley of soft, sandy loam. We also know that at certain seasons of the year it has a very rapid current and large volume. Its waters are turbid with mud and washings from the mountains. Much of the soil of the bed is of that character called quicksand, the particles of which glide easily upon each other, causing large tracts of land to fall into the river, thus cutting and changing its banks. The current of the river impinges first upon one side and then upon the other, so that sometimes in a single season new land of great extent is formed. The land which is washed away upon one side of the river is usually carried by the current a great distance and then thrown up as a sand-bar upon the other side.

Some care ought to be exercised in applying the doctrine of accretion in such a region. The law on this subject is borrowed from England where it was applied to tidal rivers. It is well known that the rivers of England in which the tide ebbs and flows are rivers in whose banks the changes are very slight and cover a long period of time.

The test of the applicability of the doctrine is, whether the land is formed so slowly as to be imperceptible. If the new

formation can be discerned the doctrine does not apply. Imperceptible, in this sense, means what is not discernible when the situations at two periods, somewhat apart, are compared. *Rex* v. *Yarborough*, 3 B. & C. 91; *S. C.* (House of Lords) 2 Bligh (N. S.) 147.

While it is true that a case can be imagined where the made land had formed in such a slow and gradual manner as to be accretion and be governed by the law thereof upon the banks of the Missouri River, yet taking the known character of that river in connection with the allegations of the bill, which show affirmatively that this river is one in which the changes are frequent, rapid and great, and that the land in question formed with a rapidity which, in England, would have been contrary to all ideas of accretion, we submit that the bill shows on its face, in connection with the facts of which judicial notice is taken, that the doctrine of accretion does not apply to the land in dispute. As "imperceptible" means, what is not discernible when the situation at two periods not widely apart is compared, it would seem to be a great hardship to apply the doctrine of accretion to such changes, where what is formed on one side and lost on the other is transferred so rapidly, and where the land is easily identified as being the quarter section or the fractional lot which, last year, belonged to a neighbor on the opposite side of the stream.

The words "slow" and "imperceptible," as understood by a conservative English landowner, mean quite different ideas from what they do to an active denizen of Omaha, Nebraska. The word "slow" as applied to changes in the banks of the Thames from Blackwall to its mouth may have quite a different meaning from that of the same word applied to changes in the Missouri River. The bill shows a change of a mile in about nineteen years, "imperceptible" at any one moment of time. The law of accretion can have no application to such changes.

II. Taking the allegations of the bill most strongly against the pleader we have a right to assume that some area, however narrow, had formed between the original lot four (4) and the river after the date of the survey and before the time

when the land was entered. If so, said strip belonged to the United States, and the accretions, if any, subsequently formed should go to the government. The right to alluvion depends on contiguity, and the accretions belong to the land immediately adjoining the water, however narrow it may be, or whatever may be the size of the parcel behind it. *Saulet* v. *Shepherd*, 4 Wall. 502; *Granger* v. *Swart*, 1 Wool. C. C. 88.

III. Conceding that the entry of Edmund Jefferis passed from the government to Edmund Jefferis all the land to the river, still the bill fails to show that the deed of Jefferis to Still and Town by apt words described the land which may have formed between the date of his entry and the date of the deed.

The bill states that by several mesne conveyances the complainant acquired the title to lot four (4) in the year 1886. It also states that between 1853 and 1877 some forty (40) acres of land were formed between the lot line and the river line of 1877, but it fails to state that any of the chain of deeds under and through which complainant claims title, contained descriptive words covering and including any part of these forty (40) acres of added land. The question is: What passed by the successive deeds of lot four (4) under which complainant claims?

If the land in question is to be regarded as accretion, we claim that it does not pass by a deed describing only the land to which such accretion has been made. *Granger* v. *Swart*, *ubi sup.*; *Lammers* v. *Nissen*, 4 Nebraska, 245; *Lamb* v. *Ricketts*, 11 Ohio, 311; *Jones* v. *Johnston*, 18 How. 150.

*Mr. J. M. Woolworth* and *Mr. C. J. Greene* for appellee.

MR. JUSTICE BLATCHFORD, having stated the case as above reported, delivered the opinion of the court.

The grounds upon which the Circuit Court proceeded in overruling the demurrer to the bill are stated by it in its opinion to be these: (1) It being alleged in the bill that the added land was formed by "imperceptible degrees," although the increase was great, resulting in the addition of many acres, yet the time during which it was made was nearly twenty

years, and an increase might have been going on, imperceptible from day to day and from week to week, which, during the lapse of so many years, might result in the addition of all the land; and hence the averment of the bill cannot be overthrown, notwithstanding what is known of the character of the Missouri River and of the soil through which it flows, and of the rapid changes in its banks which are constantly going on. (2) Where a water line is the boundary of a given lot, that line, no matter how it shifts, remains the boundary; and a deed describing the lot by number or name conveys the land up to such shifting water line, exactly as it does up to the fixed side lines; so that, as long as the doctrine of accretion applies, the water line, no matter how much it may shift, if named as the boundary, continues to be the boundary, and a deed of the lot carries all the land up to the water line.

The propositions contended for by the defendant are these: (1) Taking the allegations of the bill with those facts in relation to the Missouri River of which the court will take judicial notice, it appears that the formation in question was not accretion. (2) Taking the allegations of the bill most strongly against the plaintiff, it must be assumed that some area, however narrow, had formed between the time when the survey was made, in 1851, and the time when the land was entered by the patentee, in October, 1853. (3) The patentee, by the deed made by him to Still and Joseph I. Town, conveyed only "lot 4;" and, while the successive grantees held the title to that lot, accretions were formed of greater or less extent, which were never conveyed to the plaintiff, the deeds to it calling only for lot 4. The substance of this contention is that, as the conveyance by the patentee to Still and Joseph I. Town described the land simply as "lot 4," it passed the title to that lot as it was at the date of the survey in 1851, and not at the date of the deed, in 1856, and thereby excluded the new land formed after the survey of 1851; and that, as accretions of greater or less extent were formed while the several successive grantees held the title, such accretions did not pass by their respective deeds, and the title thereto has not come to the plaintiff.

It is distinctly alleged in the bill, that the new land is an accretion to that originally purchased by the patentee from the United States. The rule of law applicable to such a state of facts is thus stated by this court in *New Orleans v. United States*, 10 Pet. 662, 717: "The question is well settled at common law, that the person whose land is bounded by a stream of water which changes its course gradually by alluvial formations, shall still hold by the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory; and, as he is without remedy for his loss in this way, he cannot be held accountable for his gain." And in *Banks v. Ogden*, 2 Wall. 57, 67, it is said: "The rule governing additions made to land bounded by a river, lake or sea, has been much discussed and variously settled by usage and by positive law. Almost all jurists and legislators, however, both ancient and modern, have agreed that the owner of the land thus bounded is entitled to these additions. By some, the rule has been vindicated on the principle of natural justice, that he who sustains the burden of losses and of repairs, imposed by the contiguity of waters, ought to receive whatever benefits they may bring by accretion; by others it is derived from the principle of public policy, that it is the interest of the community that all land should have an owner, and most convenient that insensible additions to the shore should follow the title to the shore itself."

It is contended by the defendant that this well-settled rule is not applicable to land which borders on the Missouri River, because of the peculiar character of that stream and of the soil through which it flows, the course of the river being tortuous, the current rapid, and the soil a soft, sandy loam, not protected from the action of water either by rocks or the roots of trees; the effect being that the river cuts away its banks, sometimes in a large body, and makes for itself a new course, while the earth thus removed is almost simultaneously deposited elsewhere, and new land is formed almost as rapidly as the former bank was carried away.

But it has been held by this court, that the general law of accretion is applicable to land on the Mississippi River; and, that being so, although the changes on the Missouri River are greater and more rapid than on the Mississippi, the difference does not constitute such a difference in principle as to render inapplicable to the Missouri River the general rule of law.

In *Jones* v. *Soulard*, 24 How. 41, it was held that a riparian proprietor on the Mississippi River at St. Louis was entitled, as such, to all accretions as far out as the middle thread of the stream; and that the rule, well established as to fresh-water rivers generally, was not varied by the circumstance that the Mississippi at St. Louis is a great and public water-course. The court said that from the days of Sir Matthew Hale all grants of land bounded by fresh-water rivers, where the expressions designating the water line were general, conferred the proprietorship on the grantee to the middle thread of the stream, and entitled him to the accretions; that the land to which the accretion attached in that case was an irregular piece of 79 acres, and had nothing peculiar in it to form an exemption from the rule; that the rule applied to such a public water-course as the Mississippi was at the city of St. Louis; and that the doctrine that, on rivers where the tide ebbs and flows, grants of land are bounded by ordinary high-water mark, had no application to the case, nor did the size of the river alter the rule.

In *Saulet* v. *Shepherd*, 4 Wall. 502, the doctrine of accretion was applied in respect of a lot of alluvion or *batture* in the Mississippi River fronting the city of New Orleans, in favor of the riparian proprietor; and it was held that the right to the alluvion depended upon the fact of the contiguity of the estate to the river, and that where the accretion was made to a strip of land which bordered on the river, the accretion belonged to such strip and not to the larger parcel behind it, from which the strip, when sold, was separated.

In *County of St. Clair* v. *Lovingston*, 23 Wall. 46, the same doctrine was applied to a piece of land situated on the east bank of the Mississippi River opposite St. Louis. It was there held that where a survey began " on the bank of the river,"

and was carried thence " to a point in the river," the river
bank being straight and running according to such line, the
tract surveyed was bounded by the river; that alluvion meant
the addition to riparian land, gradually and imperceptibly
made, through causes either natural or artificial, by the water
to which the land was contiguous; that the test of what was
gradual and imperceptible was that, although the witnesses
might see from time to time that progress had been made, they
could not perceive it while the process was going on; and that
it was alluvion whether the addition was made on a stream
which overflowed its banks, or on one which did not. The
authorities on the subject are collected in the opinion in that
case.

The rule is as applicable to the Missouri River as it is to the
Mississippi, whether the principle on which it rests be that the
riparian owner is entitled to the addition to his land because
he must bear without compensation the loss of land caused by
the action of the water and any consequent expense of repair
to the shore, or whether that principle be one of public policy,
in that it is the interest of the community that all lands should
have an owner, and most convenient that insensible additions
to the shore should follow the title to the shore.

In the present case, the land in question is described in the
bill as a tract of 40 acres and more. How much, if any, of it
was formed between the date of the original survey in 1851
and the time of the entry in October, 1853, cannot be told;
nor how much was formed between 1853 and 1856, while the
patentee owned the lot; and so in regard to the time when it
was owned by each successive owner. There can be, in the
nature of things, no determinate record, as to time, of the steps
of the changes. Human memory cannot be relied on to fix
them. The very fact of the great changes in result, caused by
imperceptible accretion, in the case of the Missouri River,
makes even more imperative the application to that river of
the law of accretion.

The bill must be held to state a fact, in stating that the land
in question was formed by "imperceptible degrees," and that
the process, begun in 1853 and continued until 1870, resulting

in the production by accretion of the tract of 40 acres and more, " went on so slowly that it could not be observed in its progress, but at intervals of not less than three or more months it could be discerned by the eye that additions greater or less had been made to the shore." The fact, as thus stated, is, that the land was formed by imperceptible degrees, within the meaning of the rule of law on the subject, and it is not capable of any construction which would result in the conclusion that the land was not formed by imperceptible degrees.

In the Roman law, it was said in the Institutes of Gaius, Book II, § 70: " Alluvion is an addition of soil to land by a river, so gradual that in short periods the change is imperceptible; or, to use a common expression, a latent addition." Justinian says, Institutes, Book II, title 1, § 20: " That is added by alluvion, which is added so gradually that no one can perceive how much is added at any one moment of time."

The same rule was introduced into English jurisprudence. Bracton says, Book II, c. 2: " Alluvion is a latent increase, and that is said to be added by alluvion, whatever is so added by degrees, that it cannot be perceived at what moment of time it is added ; for although you fix your eyesight upon it for a whole day, the infirmity of sight cannot appreciate such subtle increments, as may be seen in the case of a gourd, and such like." Blackstone says, 2 Com. 262: " And as to lands gained from the sea, either by *alluvion,* by the washing up of sand and earth, so as in time to make *terra firma ;* or by *dereliction,* as when the sea shrinks back below the usual water mark ; in these cases the law is held to be, that if this gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining. For *de minimis non curat lex ;* and besides, these owners being often losers by the breaking in of the sea, or at charges to keep it out, this possible gain is therefore a reciprocal consideration for such possible charge or loss."

The whole subject was fully considered in England, in the case of *Rex* v. *Lord Yarborough,* in the King's Bench, 3 B. & C. 91; *S. C.* in the House of Lords, 2 Bligh N. S. 147 and 1 Dow & Cl. 178; *S. C.* sub. nom. *Gifford* v. *Lord Yarborough,*

in the House of Lords, 5 Bing. 163; where it was decided in effect that in cases of alternate accretion and decretion, the riparian proprietors had movable freeholds; that is, moving into the river with the soil as it was imperceptibly formed, and then again receding, when by attrition it was worn away. Lord Yarborough owned lands immediately adjoining the sea, to prevent the encroachment of which upon his lands he built sea walls on two sides. The ooze, sand and soil from the sea were gradually deposited outside of and against these walls, until, by the accretion, some 450 acres of land were made in a short time, which the Crown claimed against him. But the court of the King's Bench held, and the decision was affirmed by the House of Lords, that, the land being formed by the gradual and imperceptible action of the sea, Lord Yarborough and not the Crown was entitled to it. See, also, *In re Hull & Selby Railway,* 5 M. & W. 327; *Scratton* v. *Brown,* 4 B. & C. 485.

The doctrine of the English cases is, that accretion is an addition to land coterminous with the water, which is formed so slowly that its progress cannot be perceived, and does not admit of the view that, in order to be accretion, the formation must be one not discernible by comparison at two distinct points of time.

In *New Orleans* v. *United States, supra,* the accretion was 140 feet in width, formed in 22 years. In *County of St. Clair* v. *Lovingston, supra,* the court says: "In the light of the authorities, alluvion may be defined as an addition to riparian land, gradually and imperceptibly made by the water to which the land is contiguous. . . . The test as to what is gradual and imperceptible in the sense of the rule is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on." To the same effect are *Jones* v. *Johnston,* 18 How. 150; *Jones* v. *Soulard,* 24 How. 41; *Schools* v. *Risley,* 10 Wall. 91; *Halsey* v. *McCormick,* 18 N. Y. 147; *Mulry* v. *Norton,* 100 N. Y. 424; *Hopkins Academy* v. *Dickinson,* 9 Cush. 544; *Camden & Atlantic Land Co.* v. *Lippincott,* 16 Vroom (45 N. J. Law), 405.

The accretion set forth in the bill is alleged to have taken place between 1853 and 1870; and it is not alleged that the sudden change in the course of the river in 1877 caused any accretion. There is no suggestion in the bill that the land made by the accretion can be identified as having been previously the land of any particular person. There can be no identification unless there is a sudden change, and that is the very opposite of an imperceptible accretion.

We come now to consider the question of what passed by the description in the patent of the land as lot 4, containing 37.24 acres, according to the official plat of the survey of the land, returned to the General Land Office by the surveyor general.

The bill alleges that in 1851, when the township was surveyed, the meander line of the river, as marked on the plat, ran along the bank of the river, and that at the time of the entry in 1853 the meander line of the left bank of the river was the same, or nearly the same, as that shown by the field-notes and on the plat made, returned and approved in 1851. On these facts it is contended for the defendant that the title to any new land which may have been made between 1851 and 1853, by accretion, did not pass to the patentee by the grant of lot 4 in the patent, but remained in the United States. The plaintiff, on the other hand, contends that the description in the patent of the land as lot 4 in effect made the river the boundary on the north, and passed the title of the United States to any new land that might have been formed before that time.

The bill states that the register's certificate and the patent described the land as lot 4, in fractional section 21, in township 75 north, range 44 west, of the fifth principal meridian, containing 37.24 acres, according to the official plat of the survey of said land, returned to the General Land Office by the surveyor general. That plat, of which a copy is annexed to the bill and marked Exhibit A, shows the Missouri River as the north boundary of lot 4, and that lot is marked on the plat as containing 37.24 acres.

It is a familiar rule of law, that, where a plat is referred to in a deed as containing a description of land, the courses, dis-

tances, and other particulars appearing upon the plat are to be as much regarded, in ascertaining the true description of the land and the intent of the parties, as if they had been expressly enumerated in the deed. *Fox* v. *Union Sugar Refinery*, 109 Mass. 292. This rule is applicable to government lands bounded by the Missouri River, as the same are surveyed and platted under the acts of Congress; and the patent passed the title of the United States to lot 4, not only as it was at the time of the survey in 1851, but as it was at the date of the patent in 1855, so that the United States did not retain any interest in any accretion formed between the survey in 1851 and the date of the patent.

No different rule is established by the acts of Congress which provide for the survey and sale of the public lands. The provisions found in section 2395 *et seq.* of the Revised Statutes, in regard to the survey of the public lands, are reënactments of statutes passed in 1796, 1800, 1805, 1820 and 1832. According to these provisions, section 21 being a fractional section, because the river cut through it on its north side, the east and west side lines of lot 4 were to be run north to the river. No provision was made for running the north boundary line of lot 4, but the river formed such north boundary without the running of any line there. The statute provided, that where the course of a navigable river rendered it impracticable to form a full township of six miles square, and in those portions of fractional townships where no opposite corresponding corners could be fixed, to which to run straight lines from established corners, the boundary lines should be ascertained by running from the established corners, due north and south or east and west lines, as the case might be, to the water course, Indian boundary line, or other external boundary of such fractional township.

In the present case, the plat was made in accordance with the statute, showing the river as the northern boundary of fractional section 21 and of lot 4 therein; and, as the patent referred to the official plat of the survey, and thus made that a part of the description of lot 4, that description made the river the boundary of lot 4 on the north.

In *Railroad Co.* v. *Schurmeir*, 7 Wall. 272, this court said: " Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction, subject to sale, and which is to be paid for by the purchaser. In preparing the official plat from the field-notes, the meander line is represented as the border line of the stream, and shows, to a demonstration, that the water-course, and not the meander line, as actually run on the land, is the boundary."

We are, therefore, of opinion, that the patent of June 15, 1855, which described the land conveyed as lot 4, according to the official plat of the survey, of which a copy is annexed to the bill, marked Exhibit A, conveyed to the patentee the title to all accretion which had been formed up to that date.

The case of *Jones* v. *Johnston*, 18 How. 150, is cited by the defendant as holding that a grantee can acquire by his deed only the land described in it by metes and bounds, and cannot acquire, by way of appurtenance, land outside of such description. But that case holds that a water line, which is a shifting line and may gradually and imperceptibly change, is just as fixed a boundary in the eye of the law as a permanent object, such as a street or a wall; and it justifies the view announced by the Circuit Court in its opinion, that where a water line is the boundary of a given lot, that line, no matter how it shifts, remains the boundary, and a deed describing the lot by number or name conveys the land up to such shifting line exactly as it does up to a fixed side line. See, also, *Lamb* v. *Rickets*, 11 Ohio, 311; *Giraud's Lessee* v. *Hughes*, 1 G. & J. 249; *Kraut* v. *Crawford*, 18 Iowa, 549.

These views result in the conclusion, that the side lines of lot 4 are to be extended to the river not as the river ran at the time of the survey in 1851, but as it ran at the date of the patent in 1855; and that all the land which existed at the latter date, between the side lines so extended and between the line of the lot on the south and the river on the north, was conveyed by the patent.

All the grantors in the deeds made subsequently to the patent, including the patentee, described the land in their successive deeds as lot 4. It is contended by the defendant, that this description conveys the land as it was at the date of the entry, or, at most, at the date of the patent; that as, from the allegations in the bill, it must be intended that some accretion was formed between July 14, 1856, the date of the deed by the patentee, and September 21, 1857, the date of the deed by Joseph I. Town to McCoid, the description of the land as lot 4 in the latter deed was not adequate to pass to the grantee the new land, and, therefore, all the land which was formed afterwards belonged to Still and Joseph I. Town, and not to McCoid; also, that if, in point of fact, there was no accretion between July, 1856, and September, 1857, there must have been accretion subsequently, while some of the successive grantees held the title prior to 1870.

But we think that in all the deeds the accretion passed by the description of the land as lot 4. In making every deed the grantor described the land simply as lot 4, and did not, by his deed, nor does it appear that he has since or otherwise, set up any claim to any accretion. It must be held, therefore, that each grantor, by his deed, conveyed all claim not only to what was originally lot 4, but to all accretion thereto. When McCoid, in 1854, conveyed his interest in the premises by the description of lot 4, as he had taken a deed of the undivided half of the premises by the same description from Joseph I. Town, in September, 1857, and had title thereby up to the river, his north line was the river, which was gradually adding land to his land. How much was added during the time he owned his undivided half he could not tell, and he conveyed his interest to Coleman without any reservation. The same is the case with each successive grantor, and each must be held to have passed by his deed his title to all the land up to the river, as the river was at the date of his deed. When each successive owner took his title, lot 4 was a water lot, having the rights of wharfage, landing and accretion; and although new land was formed during his ownership, yet when he conveyed the premises he conveyed them by the same

description by which he had received the valuable rights referred to.

The decree of the Circuit Court is                    *Affirmed.*

Mr. Justice Miller did not take any part in the decision of this case.