EAST OMAHA LAND COMPANY, Appellee, v. JENS HANSON, *et al.*, Appellants.

Accretion: ISLANDS: *Riparian owner.* Where an island springs up in the midst of a stream, it is an accretion to the soil in 1 the bed of the river, and not to the land of the riparian owner.

*Same.* An island formed between 1862 and 1870 cannot be said to 2 have accreted to a lot across the channel, when the channel itself was not drained and filled up until about 1890.

Agreement to Obey Judgment: *Consideration.* An agreement between a claimant and the grantee of certain land that, if a case pending in court was decided in favor of claimant, 3 grantee would yield immediate possession of the land upon payment to him of what he had paid in cash,—there being no evidence that claimant forebore bringing suit or incurred any expense by virtue thereof,—is without consideration and cannot be enforced.

STATUTE OF FRAUDS. An oral agreement between a claimant and one in possession that certain lands would be surrendered if a case in court was decided in favor of the claimant was not a 4 lease, but related to the transfer of real estate, and was therefore within the statute of frauds.

*Appeal from Pottawattamie District Court.*—HON. WALTER I. SMITH, Judge.

MONDAY, MAY 19, 1902.

THIS is a controversy over a strip of land which at one time constituted the bed of the Missouri river. The trial

court found for the plaintiff, and the defendant appeals. The facts will be stated in the body of the opinion.—*Reversed.*

*Jacob Sims* for appellant.

*Greene, Breckenridge & Kinsler* for appellee.

DEEMER J.—I.    The controversy is over a tract of land which was at one time a part of the bed of the Missouri river.    Plaintiff contends that by the mutations of the waters of that capricious and inconstant stream the land accreted to what was originally government lot 2, adjoining section 21, in township 75, range 44, in Pottawattamie county, and lying in the bend of the Missouri river at the time of the original government survey, while the defendants say that the land is part of an island which was formed in the bed of the Missouri river many years ago, and that no part of it belongs to plaintiff.    Plai ti f further contends that defendants hold possession as its tenants under a parol lease whereby they (defendants) were to have possession until the determination of *Jefferies v. Land Co.*, 134 U. S. 178 (10 Sup. Ct. Rep. 518, 33 L. Ed. 872), and in the event that action was determined in plaintiff's favor, defendants were to surrender possession on demand; that the case has been determined; and that defendants refuse to surrender.    Defendants deny the alleged lease, and claim title in themselves.    To a better understanding of the case, the following plat, although not strictly accurate, is made a part of this opinion:

Lot 2 is within the curve of the horseshoe, and when the original survey was made the west line of the lot was the east bank of the Missouri river.    In 1877 the "cut-off" referred to in *State of Nebraska v. State of Iowa*, 143 U. S. 359 (12 Sup. Ct. Rep. 396, 36 L. Ed. 186), occurred, and all the land lying within what we have called the "horseshoe"

is now west of the river, and apparently on the Nebraska side. In *State of Nebraska v. State of Iowa*, it is held, however, that the land lying within this horseehoe is still within this jurisdiction, and the larger part of what is now East Omaha is in fact in Iowa, although west of the Missouri river as it now runs. The tract in dispute is now dry

land, and the principal question in the case is whether it accreted to lot 2, or is a part of an island which formed in the river immediately west of the lot 2, and which is now owned by defendants. Plaintiff denies that the tract marked upon the plat "Island or Sandbar", of which the land in controversy is a part, ever was an island, and contends that it formed imperceptibly and gradually to the

west line of lot 2, and should be treated as an accretion thereto.

Plaintiff's title to lot 2, down to the time of the cut-off, was to high-water mark; and this line is so well defined by our cases that we need only refer to them, without making quotations of language used. *Houghton v. Railroad Co.*, 47 Iowa, 370; *Bennett v. Manufacturing Co.*, 103 Iowa, 211. Of course, this line is subject to change with the encroachment or subsidence of the water. But if an island springs up in the midst of a stream, whether it be on one side or the other of the thread of the river, the islet, when formed, is an accretion to the soil in the bed of the river. The riparian owner does not take the accretion, for the reason that it is not added to his land, but to the island or "sandbar", as plaintiff's counsel is pleased to call it. *Holman v. Hodges*, 112 Iowa, 714, and cases cited. The facts in this case are very similar to those appearing in the *Holman Case*, and much stronger than in some of the cases cited therein. There is no doubt that an island or sandbar formed in the river west of plaintiff's lot many years prior to the time this controversy arose, and it is equally clear that a considerable quantity of land accreted to this island on the west as the river cut into the Nebraska bank. For many years there was a channel east of this island or bar, and only during comparatively recent years had this channel been closed. The island was first joined to the mainland at the northern extremity thereof, far above lot 2. The bar or island was the highest tract of land in this vicinity, and during the historic flood of the year 1881, which covered the entire Missouri river bottoms, it was above water. This island was formed between the years 1862 and 1870, and the channel of the river on the east side thereof was not filled up until about the year 1890, when plaintiff graded two streets across it, and drained the water therefrom by artificial means. Surely it will not do to say, on this

statement of the record, that the land in controversy ac-creted to lot 2. As in the *Holman Case*, the additions to plaintiff's land have resulted from the formation of the island, and are a part thereof. See, also, *Bigelow v. Hoover*, 85 Iowa, 161; *Smith v. Miller*, 105 Iowa, 688; *Cooley v. Golden*, 117 Mo. 33 (23 S. W. Rep. 100, 21 L. R. A. 300).

II. Plaintiff contends, however, that the decree in the case of *State of Nebraska v. State of Iowa*, *supra* is *res adjudicata*, and that the title to the land in controversy was by that decree found to be in plaintiff. This contention, it seems to us, is based on a misapprehension. The question of accretion or reliction was not involved in that case. The following quotation from the opinion of the supreme court of the United States will show that that court held that the cut-off of 1877 did not change the boundary line between the two states; that it remained as it was prior to the avulsion,—the center line of the old channel, which, as we have seen, was west of the land in controversy; and that, if the land east of the island was formed by the cut-off of 1877, it was not by that slow and imperceptible process which is necessary to sustain the claim of alluvion. The following is the quotation: "It appears, however, from the testimony, that in 1877 the river above Omaha, which had pursued a course in the nature of an oxbow, suddenly cut through the neck of the bow, and made for itself a new channel. This does not come within the law of accretion, but of that of avulsion. By this selection of a new channel the boundary was not changed, and it remained, as it was prior to the avulsion, the center line of the old channel; and that, unless the waters of the river returned to their former bed, became a fixed and unvarying boundary, no matter what might be the changes of the river in its new channel." Appellee's counsel say that all accretions to a state necessarily become a part of the government lots bounded by the river, and that in the case from which this quotation was made the issue was

squarely made as to whether or not the land in controversy was created by reliction or avulsion, and that the court held that the land in controversy was accreted land. We do not so understand the record, but conceding it to be true, it also appears that the supreme court expressly held that the boundary between the states at the point in controversy did not change by reason of the avulsion of 1877. This, of course, left all disputes between parties claiming to own land within the boundaries so found to be settled in the proper forum. In other words, at the point in question the boundary between the states was not changed by the cut-off of 1877, for the reason that this cut-off was, in effect, an avulsion. Surely, defendants, who were not parties to that suit, were in no manner bound by the decree, except, perhaps, as it undertook to fix the boundary line between the two states. And as the decree did not change the boundary at the point in question, the matters in dispute between the parties to this litigation are not affected thereby.

III. Lastly it is insisted that defendants went into possession of the premises under an agreement with plaintiff to the effect that if the judgment of the supreme court of the United States in the case of *Jefferies v. Land Co.*, 134 U. S. 178 (10 Sup. Ct. Rep. 518, 33 L. Ed. 872), should be decided in favor of plaintiff, he would yield immediate and peaceable possession of the land. The exact claim is that about the time Hansen purchased the land from his grantor, Williams, he (Hansen) was informed by the East Omaha Land Company, that Williams had no right or title in the claim, and that it belonged to the East Omaha Land Company, and that the land company was about to institute suit against all squatters upon these lands; that he thereupon agreed that if the company would leave him out of the suit, and make him no costs, he would occupy the claim until the decision of the United States supreme court in the *Jefferies Case* should be announced, and, in the event it was favorable to the

land company, he would yield peaceable possession upon the land company's paying him the $150 he had paid in cash to Williams; that this arrangement, being entered into as testified to by the witness, and having been acted upon in good faith, constituted Hansen the tenant or lessee of the land company; and that he cannot avail himself of the possession or permission thus obtained to question the title or right of his landlord. There is absolutely no evidence that Hansen went into possession of the land under this agreement. He was already in possession at the time when it is claimed the agreement was made. There is no evidence that the plaintiff forebore bringing suit against Hansen, and no expense was incurred by the company in virtue of the claimed agreement. There is neither plea nor evidence of estoppel, and we are constrained to hold that, if there was any such agreement, it is without consideration, and cannot be enforced. At any rate, the agreement did not create the relation of landlord and tenant, and, if made, it was nothing more than an agreement to surrender possession, which, owing to the peculiar facts of this case, should not be enforced, by reason of its being so inequitable that a court of equity will not decree a forfeiture. The agreement, if made, clearly related to the transfer of an interest in real estate and not to the creation of the relation of landlord and tenant, and was therefore within the statute of frauds. Moreover, if the so-called agreement created a lease, as claimed, then the lease was also within the statute; and, as the termination of the term did not depend on the act of either party, Hansen's continuance of possession did not take the case out of the statute. *Sobey v. Brisbee*, 20 Iowa, 106; *Mahana v. Blunt*, 20 Iowa, 142.

The case, in all its aspects, seems to be ruled by our previous decisions, and we reach the unanimous conclusion that the decree should be, and it is, REVERSED.