**UNITED STATES of America,**
**Appellant,**

v.

**62.57 ACRES OF LAND IN YUMA COUNTY, ARIZONA, Fort Yuma Land and Investment, Inc., et al., Appellees.**

**No. 25222.**

United States Court of Appeals,
Ninth Circuit.

Oct. 1, 1971.

Richard S. Allemann (argued), Asst. U. S. Atty., Richard K. Burke, U. S. Atty., Phoenix, Ariz.; Shiro Kashiwa, Asst. Atty. Gen., Washington, D. C., for appellant.

Thaddeus G. Baker (argued), of Brandt & Baker, Tom C. Cole, of Westover, Keddie & Choules, Yuma, Ariz., Charles F. Wheatley, Jr., Grace Powers Monaco, Washington, D. C., for appellees.

Before BROWNING and TRASK, Circuit Judges, and BYRNE, District Judge.*

TRASK, Circuit Judge:

The United States seeks title, by this combined condemnation-ejectment action, to 145 acres of land on the west side of the Colorado River, but in Yuma County, Arizona. This land is presently occupied by the Fort Yuma Land and Investment, Inc.[1] The United States as

---

* Honorable William M. Byrne, Senior United States District Judge, Los Angeles, California, sitting by designation.

1. The lands in question are now west of the Colorado River, but remain part of the State of Arizona by virtue of the

appellant claims title to the property as accretion to federal lands riparian to the river on the California side. The appellees claim title to the same land by virtue of two patents issued to their predecessors in title. They contend that when the two patents issued there was a small portion of the patented land which was on the California side. From this riparian foothold appellees claim the lands by accretion and deny the claim of the United States for lack of riparian ownership.

The United States District Court during the trial made findings of some facts which were undisputed and entered an order consisting of twelve items which it stated involved controlling questions of law as to which there was a substantial ground for difference of opinion, and that an immediate appeal from the order might materially advance the ultimate termination of the litigation. Under 28 U.S.C. § 1292(b) an interlocutory appeal was applied for and allowed by this court.

Anna Roberts made a homestead entry in 1901 upon the NE¼ of Section 8, Township 8 S., Range 22 W., of the Gila and Salt River Meridian. Patent to the land issued in 1905 exactly as described in the entry. John B. Caruth made a homestead entry in 1904 to the NW¼, Section 9, Township 8 S., Range 22 W., of the Gila and Salt River Meridian and patent was duly issued with an identical legal description in 1925. (Appellant's brief at 4). These lands described in relation to the Gila and Salt River Meridian were situated on the east side of the river in the State of Arizona and were nonriparian parcels at the dates of entry. Lands on the west side of the Colorado River insofar as they are involved here, were owned by the United States. They had been officially surveyed in 1856 and their legal descriptions were tied to the San Bernardino Meridian. That survey did not show the lands in question here because at that time they were on the east side of the river.

From 1874 to the dates which are critical to this litigation, the Colorado River in the area of the proposed patents had gradually moved eastward.[2] It is the contention of the appellees that as of the date of the patent of the Roberts parcel and of the Caruth parcel, and as a result of the movement of the river, portions of the quarter sections described in their patents were located on the west side of the Colorado River and were conveyed by those patents. This gave appellees the claim of a riparian foothold on the west side so that accretions there, resulting from the river's eastward movement, would add to appellees' land. Appellants respond that this is a disputed question of fact to be resolved at trial, but even assuming its verity, the patents could under no circumstances have been effective to convey land on the California side of the river. This for the reason that the legal descriptions in the patents were in terms of the Gila and Salt River Meridian which referred to Arizona lands on the east side of the river, and simply did not describe any lands on the west side of the river.

The order of the district court which creates the question of law includes the following items of dispute:

"WHEREFORE, IT IS ORDERED, ADJUDGED AND DECREED:

\* \* \* \* \* \*

"5. That the controlling date as to the effect of the Colorado River in relation to the lands is the date of issuance of the patents, that is, February 17, 1905, as to the Roberts' patent, and June 29, 1925 as to the Caruth patent.

---

Interstate Compact Defining the Boundary Between the States of Arizona and California (Act of August 11, 1966, 80 Stat. 340). Otherwise, the Colorado River having been the boundary between Arizona and California, the lands would presently be located in the state of California.

2. It was stipulated that for the purposes of this order only, the movement of the Colorado River was by a process of accretion rather than by avulsion. C.T. 371.

\* \* \* \* \* \*

"9. That regardless of the position of the Colorado River as of the date of the issuance of the respective patents, each patent conveyed the entire one-quarter section applied for except any portion that might be in the river bed.

"10. That if any land described in the application for either patent lay west of the westerly ordinary low water mark of the Colorado River and riparian to it as of the date of issuance of the respective patents, said land was conveyed to the patentee.

"11. That any eastward accretive movements of the Colorado River subsequent to the issuance of the patents would add and accrete to any lands conveyed by the patents which lay on the west side of and riparian to the Colorado River.

"12. That a patent describing a quarter-section of land in Arizona by reference to the Gila and Salt River Base and Meridian conveys any portion of that aliquot part which at the time of issuance of the patent is physically located in California by reason of erosive and accretive movements of the Colorado River subsequent to the Gila and Salt River Base and Meridian survey." C.T. 371–72.

With respect to the controlling date for identifying the position of the river with relation to the lands, no case has been called to our attention which is decisive on the point. Appellants reason from the cases holding that when a patent issues, the legal title thus acquired relates back to the date of entry. United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 334–335, 26 S.Ct. 282, 50 L.Ed. 499 (1906). Thus they urge that entry is the controlling date because rights are established then. As of that date they contend the lands were in Arizona and no accretions on the west side of the river could attach to them. A closer view of *Detroit Lumber*, however, as appellees are quick to point out, discloses that the court there says the doctrine is one designed to cut off the rights of intervening claimants. *Id.* at 335, 26 S.Ct. 282. That view adopts the reasoning of the Court in Gibson v. Chouteau, 13 Wall. 92, 80 U.S. 92, 20 L. Ed. 534 (1871), where it said:

"[T]he doctrine of relation is a fiction of law adopted by the courts solely for the purpose of justice, and is only applied for the security and protection of persons who stand in some privity with the party that initiated proceedings for the land. \* \* \*" 80 U.S. 100.

Thus appellees argue that the relation back theory has no application here as between a grantor and grantee to alter the obligation to convey land as called for in the entry and patent.

Appellees insist that it is the date of patent which is the controlling date for determining the position of the river. With this legal position established they hope to prove that as of those dates there was a portion of the lands in question which was situated on the west side of the river and riparian thereto, to which accretions could attach and that these riparian lands were conveyed to appellees. Appellees cite authorities which tend to support their position although not directly apposite. The case most nearly in point, according to appellees, is Johnston v. Jones, 66 U. S. 209, 17 L.Ed. 117 (1862), which involved a dispute between two claimants to land formed by accretion on the shore of Lake Michigan. A claimed error in the proceedings below was a failure to consider a title bond given by grantor to grantee prior to actual conveyance of title, which would have created an equitable right in the grantee. It was asserted that the doctrine of relation back would then apply. Said the Court:

"The plaintiff could recover only upon a legal title. That title was vested in him, if at all, by the deed from Robert A. Kinzie of the 22d of October, 1835. The equities subsisting at any time between those parties could not in any

wise affect the result of the action." *Id.* at 221.

We agree with appellees and the trial court that the doctrine of relation back does not assist the appellants and that the date of patent is the controlling date.

The government relies also on Jefferis v. East Omaha Land Co., 134 U.S. 178, 10 S.Ct. 518, 33 L.Ed. 872 (1890). In this case the land patented was described as Lot 4 "according to the official plat of the survey of said land, returned to the general land-office by the surveyor general." *Id.* at 194, 10 S.Ct. at 522. That plat, however, shows the Missouri River as the north boundary of Lot 4. The Court therefore held that:

"[T]he patent passed the title of the United States to lot 4, not only as it was at the time of the survey in 1851, but as it was at the date of the patent in 1855, so that the United States did not retain any interest in any accretion formed between the survey in 1851 and the date of the patent." *Id.* at 195, 10 S.Ct. at 522.

Thus it was the date of the patent which controlled the size of the estate which the patentee acquired. And if a river marked one of the boundaries as of the date of entry then the patentee took his estate accordingly, be there erosion or accretion.

The difference between *Jefferis* and the case now before us is that here there was no boundary marked by the Colorado River as of the date of entry or survey.

Nor can appellant rely upon Beaver v. United States, 350 F.2d 4 (9th Cir. 1965), cert. denied, 383 U.S. 937, 86 S. Ct. 1067, 15 L.Ed.2d 854 (1966). There the patent had issued according to the legal description in the application for entry. All of the land there appears to have been in Arizona at the date of patent.[3] Thereafter, the accretion occurred which eroded the patented land on the Arizona side and increased the lands on the other side of the river. Under those circumstances *Beaver* understandably held that the lands on the California side after patent issues gained by the accretion and those on the Arizona side were lost by erosion.

More to the point in this case, it seems, is the extent of the estate conveyed by the patent. Borrowing from appellant's brief, the patent to the Roberts parcel described the land exactly as it was described in the homestead entry, as NE ¼ of Section 8, Township 8 S., Range 22 W., Gila and Salt River Meridian. There was no reference to the Colorado River. In addition, the legal description purported to convey 160 acres of land "according to the Official Plat of the survey of said lands returned to the General Land Office by the Surveyor General." As of the date of this patent the Colorado River is alleged to have bisected the parcel from north to south leaving a portion of the land on the west side. So long as the lands on both sides of the river were owned by the United States, variations in its course made no real difference. The government could still convey the 160 acres called for. If the homestead entryman perfected his application and paid the fees for 160 acres and received a patent without modification because of the location of the river, or reservation of riparian rights, the patent should be held to invest him with title to that parcel subject only to the rights which the United States might retain in the waters by virtue of their navigable character.

The government next contends that because the legal description was subject to surveys controlled by the Gila and Salt River Meridian in Arizona, it did not convey lands on the California

---

3. The opinion is clear on this point. "The tract in question is in the same physical location as land patented to appellants' predecessor in title in 1914, *and, at that time located in Arizona.* * * * Between 1902 and 1942 the river channel moved in a southerly direction until it established the channel approximately in its present location." (Emphasis added). 350 F.2d at 6.

side, after the change in the location of the river occurred. The description simply became *functus officio* beyond the east bank. There was no other legal description in the instrument relating to a survey of California lands. We do not agree. The land at the date of the entry had been officially surveyed.

> "It is a familiar rule of law that, where a plat is referred to in a deed as containing a description of land, the courses, distances, and other particulars appearing upon the plat are to be as much regarded, in ascertaining the true description of the land and the intent of the parties, as if they had been expressly enumerated in the deed." Jefferis v. East Omaha Land Co., 134 U.S. 178, 194, 10 S.Ct. 518, 522.

It could be and was located and identified on the ground from that survey. The entryman had presumably gone upon it for homestead purposes. The land did not move. Had the entryman erected permanent monuments at the four corners, those same four corners could have been identified even though the river in the meantime may have moved across two of them. It is apparently agreed that as of the date of the Roberts patent there was no other survey in existence from which the lands could have been located. They were, therefore, not subject to any conflicting survey tied to the coordinates of a different meridian.[4]

As to the Caruth patent, the land described in the entry could likewise be located from the 1874 official survey based upon the Gila and Salt River Meridian to which the land was tied. There was no other survey which de-

scribed these lands at date of entry. At the date of patent in 1925 it is unclear from the record before us whether there had been a survey of the lands on the California side tied to the San Bernardino Meridian which had accreted since the entry of Caruth. It would have made no difference to the validity of the Caruth patent which undertook to convey 160 acres of a definite section, township and range according to an official survey. These lands had been identified and located on the ground, and occupied by the entryman.[5] Again the legal description obligating the government to convey was not tied to the bank of the river. It was a parcel of 160 acres described by fixed positions established by coordinates from which the parcel could be located. The grantor owned the land on both sides of the river.

The government had accepted the application for the Caruth entry as containing an adequate description at that date. The entry was physically made. The government then caused another survey to be made which was tied to different coordinates (the San Bernardino survey), but covered the same area although it did not accurately describe the particular 160 acre parcel.[6] It is impossible to believe that the same owner and grantor by making a later conflicting survey could invalidate the earlier one under which entry had already been made and which clearly described the acreage on the ground. The situation is not dissimilar to a very early case decided by Mr. Chief Justice John Marshall. In that case the entry was of land in Monongalia County, Virginia. In accordance with the Virginia land law the entry application was required to be de-

---

4. The 1856 San Bernardino survey did not extend to accreted lands east of the banks of the river as they existed at that time. The survey would not cover lands east of the river as of that date, nor subsequent accretions on the west side. The 1874 survey did, of course, exactly locate the lands at date of entry.

5. To qualify for a patent under the Homestead Act the entryman must have gone

upon the land and actually resided there for a minimum of three years cultivating the soil and must have erected a habitable house. 43 U.S.C. § 164.

6. The two quarter-sections of 160 acres each could not be in the NE¼ and the NW¼ respectively of the section in the San Bernardino Survey, in which they were platted. This is another reason those coordinates do not control.

livered to the surveyor of the county in which the land lay. It was his duty to then survey the land applied for and issue his certificate of survey whereupon the patent would be issued to conform to the certificate. Between the date upon which the certificate of survey was issued as a basis for the patent of Monongalia lands, the legislature of Virginia divided that county into two counties, so that when the time for issuance of the patent arrived the land was in Harrison County. The action was one of ejectment. The defendants requested an instruction that if the land lay in a different county from that in which the survey purported to have been made, the patent was void. The trial court, however, refused, stating that even if this be true the patent would not be void. The Court affirmed.

Said Mr. Chief Justice Marshall:

"In this case, there could have been no imposition attempted on the government by the purchaser. The mistake is accounted for, and there can be no imputation on the intrinsic fairness of the transaction. The misnomer of the county might take place, as has been suggested at the bar, in a case in which all the proceedings were perfectly regular. Had the survey been made, the day before the law dividing the county of Monongalia took effect, the plat and certificate of the surveyor must have stated the land to be in Monongalia. The patent could not have issued, until six months afterwards, and must have stated the lands to lie in Monongalia, although, at the time of its emanation, they would, in fact, lie in Harrison. To say, in such a case, that the misnomer of the county could avoid the patent, would shock every sense of justice, and of law, too much to be maintained. This misnomer of the county, then, must admit of explanation; and if explanation can be received, the patent is not absolutely void." Stringer v. Young's

Lessee, 28 U.S. (3 Pet.) 320, 343, 7 L. Ed. 693 (1830).

■ So also in this case the fact that between the date of entry and the date of patent the lands for which patent was sought might have been better described by the San Bernardino coordinates, does not make the Caruth patent invalid where exact location could be shown and was established by the fact of actual entry.

■ The purpose of the legal description is to identify the parcel of land which is to be conveyed so that it can be located on the ground. It is well recognized by the decisions that if the boundaries of the parcel can be located on the ground either by the legal description in the instrument, or from information contained in the deed, the instrument is adequate. In Hardison v. McCreary, 304 F.2d 699, 701 (5th Cir. 1962), the description in a deed was claimed to be insufficient. Said the court:

"But, says Hardison, this is not necessary because McCreary acquired nothing whatever under the sheriff's deed in view of the inadequacy of the description. The law of Georgia is that a deed is sufficient if it is certain, or if it furnishes the key to identify the land intended to be conveyed. The maxim, *id certum est quod certum reddi potest*, applies. (Citations omitted). Here the description in the sheriff's deed set out the county, land district and land lot numbers in which the land was situated, the names of the adjoining land owners and that it was the property of appellant Hardison. There was evidence that the named adjoining land owners were formerly such in fact. We think these facts furnished a sufficient key to identify the land when considered in the light of the prior deeds conveying the same land to which reference may be made under the Georgia law." *Id.*

*See also* [7] Greif Brothers Cooperage

7. Note: Most of these cases involved situations where there are two competing claimants as owners. The result dictated by that adversary ownership would not necessarily control this case on issues of accretion where the same grantor owned

Corp. v. United States Gypsum Co., 341 F.2d 167, 172 (8th Cir. 1965); Anderson v. Anderson-Tully Co., 196 F.2d 684, 688 (5th Cir. 1952); Flournoy v. United States, 115 F.2d 220, 221 (5th Cir. 1940); Chidester v. City of Newark, 58 F.Supp. 787, 789 (D.N.J.1945), aff'd 162 F.2d 598 (3rd Cir. 1957); Wheeler Perry Co. v. Mortgage Bond Co. of New York, 41 Ariz. 247, 250–252, 17 P.2d 331, 332 (1932).

■ The same rule applies both in Arizona and in California. Wheeler Perry Co. v. Mortgage Bond Co. of New York, *supra;* Podd v. Anderson, 215 Cal.App.2d 660, 663–664, 30 Cal.Rptr. 345, 348 (1963). The patent here, when related to the application for entry and the entry, more than satisfied this requirement. We are therefore convinced that the patent was valid to convey the entire 160 acre parcel as described including whatever portion might lie to the west of the river. Once the patent issued the patentee would be subject to the rules of accretion and erosion.

The interlocutory order and judgment of the district court is affirmed.

the land in question on both sides of the stream. The cases are cited for the narrow proposition that the legal description tied to the Gila and Salt River Meridian together with attendant facts is legally sufficient to convey the particular 160 acres at issue.