By the Review PaNel:
This report is submitted for transmission to the Senate in accordance with 28 U.S.C. § 2509 and S. Res. 143, 91st Cong., 1st Sess. That resolution referred S. 1343, 91st Cong., 1st Sess., to the Chief Commissioner of the Court of Claims pursuant to 28 U.S.C. § 1492.
It was proposed in S. 1343 that the United ‘States “relinquish and disclaim any right, title, or interest which it may have in and to” certain lands which are now situated in Yuma County, Arizona, but which were formerly situated within *933 the boundaries of tbe State of California before the Colorado River changed its course. (The thread of the stream constitutes the boundary line between the two States in the area that is involved in the present controversy.)
The initial proceedings in this case were conducted by Trial Commissioner C. Murray Bernhardt under a designation from the Chief Commissioner of the Court of Claims. After conducting a trial in Phoenix, Arizona, and receiving requested findings of fact and briefs from the parties, Commissioner Bernhardt on April 11,1972, filed an extensive and carefully prepared report, which included an opinion and findings of fact.
Neither the plaintiffs nor the defendant indicated an intention to except to Commissioner Bernhardt’s report within the time allowed for such action by Rule 141(a). As the Trial Commissioner’s report has not been excepted to by any of the parties, and as the Review Panel agrees with such report, it has been adopted as the basis for the Review Panel’s report to the Senate.
Therefore, in accordance with S. Res. 143, 91st Cong., 1st Sess., the Review Panel informs the Senate as follows:
(1) The waiver and relinquishment of any claim of title by the United States to the real property described in S. 1343, 91st Cong., 1st Sess., is appropriate in the light of legal and equitable claims to such real property by private claimants, except that there should be excluded from such waiver and relinquishment the 52-acre portion of such property that was condemned by the United States pursuant to the complaint in condemnation filed by the United States on June 30,1964, in the United States District Court for the District of Arizona (No. Civ. 5188-Phx.) and the portion of such property submerged in the bed of the Colorado River and owned by the States of California and Arizona.
(2) The accretion claim of the United States to the lands in question accrued at various times during the period 1920-36.
(3) There would presently exist equitable defenses to the assertion of the Government’s accretion claim if it had accrued to and were now being asserted by a private party rather than the Government.
*934 The Trial Commissioner’s report, in addition to covering tbe matters on which the Senate specifically requested advice in S. Bes. 143, concluded that the plaintiffs have an equitable claim against the United States for “monetary relief or relief in kind as to the 52 acres of their property previously condemned and utilized by the Government for a rechannelization project* *
As indicated in the Trial Commissioner’s opinion and findings of fact, the United States on June 30, 1964, instituted a condemnation suit in the United States District Court for the District of Arizona (No. Civ. 5188-Phx.) against 527.93 acres of land, including 52 acres that are involved in the present proceedings, for the purpose of a river channelization project. The complaint asserted that the United States actually possessed the full fee simple title to the 52 acres, and that any ownership claim of the present plaintiffs was unfounded. The present plaintiffs were awarded a token $1 in the condemnation suit as compensation for the 52 acres.
As the Government did not except to the portion of the Trial Commissioner’s report which concluded that the plaintiffs are equitably entitled to additional compensation for the 52 acres that were condemned by the United States in the 1964 suit, this conclusion is also adopted by the Beview Panel, although it is outside the scope of the request for advice from the Senate in S. Bes. 143.
The Trial Commissioner’s opinion and findings of fact, as adopted by the Beview Panel, follow:
OPINION 0E THE TRIAL COMMISSIONER
Bernhardt, Commissioner: By Senate Besolution 143,91st Cong., 1st Sess., the Senate has referred to the Chief Commissioner of the United States Court of Claims, under authority of 28 U.S.C. § 1492, Senate Bill 1343 to waive and relinquish to the plaintiffs any claim of Federal title to 320 acres of land in Yuma County, Arizona, which had formerly been in California until the Colorado Biver went west over a period of many years. The Besolution directs the Chief Commissioner to make a report in conformity with 28 U.S.C. § 2509 sufficient to inform Congress whether such waiver and re- *935 linquisliment of Federal title would be appropriate in the light of any legal or equitable claim to the property by the private plaintiffs herein, and, in addition, to advise the Congress as to the age of any accretion claim which the United States may have to the property, and whether there are any legal or equitable defenses to the assertion by the Government of any such accretion claim were a private individual to assert such claim rather than the sovereign. The Chief Commissioner is finally directed by the Resolution to ignore any pending litigation in any forum or tribunal or any pending administrative proceedings.
Pursuant to procedures governing Congressional reference cases, the Chief Commissioner referred the claim to a trial commissioner, who conducted pretrial and trial proceedings, received requested findings and briefs from the parties based upon the trial record, and now makes this report for submission to the United States Senate, subject to approval by the Review Panel appointed by the Chief Commissioner.
The disputed land lies in the valley of the lower Colorado River. In 1966 Congress ratified a compact between Arizona and California establishing a fixed mutual boundary (80 Stat. 340) immutable to future changes in the course of the river,[1] under which compact all but a small portion of the northernmost 40 acres of the subject land in California came to rest either in what was officially Arizona or in the bed of a superseded river bend[2] whose thread constituted the agreed permanent state boundary. The agreed state boundary in relation to the 320 acres in dispute, as well as other data concerning names and dates of homestead entries and issuance of land patents, references to section and township nnmhp.TR in *936 the surveyed areas subject to the San Bernardino meridian in California and the Gila & Salt River meridian in Arizona, as well as locations of the river in 1879,1903, and 1952, and the location of a rechannelization project in 1964, are depicted in an illustration on the next page. For ease of future reference, the 320-acre disputed tract is divided in the illustration into eight 40-acre tracts to which have been arbitrarily assigned alphabetical designations A through H, inclusive. They will be referred to throughout as Tracts A, B, C, etc.
The Colorado River is an unstable, alluvial stream and as such meanders in a sinuous course through the valley defined in this area by mesa bluffs ranging from 2 to 6 miles apart. At various times in the past, the river has been located at divers points across the valley floor. At times of high flows, from March through mid-July of most years, particularly prior to the completion upriver of Hoover and Parker Dams in 1935 and 1938, respectively, much of the river valley was prone to flood from excess waters overflowing the established river channel. Except where it is artificially corseted by levees, dikes, dams and channels, the river is constantly peregrinating, mostly by imperceptibly slow accretion and erosion, but sometimes avulsively.
The first official Government survey of the California side of the river valley at relevant locations was made in 1855-56 covering township 9 south, range 21 east, San Bernardino meridian (abbreviated technically to T. 9 S., R. 21E., SBM). This survey, adopted by the Surveyor General in 1857 and hereafter referred to as the 1857 survey, included regular sections 12 and 13 (containing the 320 acres in controversy) and fractional sections 25 and 36, the latter two of which were as of 1857 bordered on the east by the Colorado River, whose center line was at that time the eastern limit of T. 9 S. Neither section 12 nor 13 was then riparian to the river.[3] The 1857 survey was the only official survey in effect covering lands involved in this case at the times the patents hereinafter de- *937 seribed were issued in 1913,1921, and 1923. Until such time as these surveys were superseded by another official Government survey covering the subject lands (which was not until 1962), all the land described by the 1857 survey could be disposed of only by reference to the SBM, regardless of whether shifts in the river bed had transposed all or part of the land to the eastern bank of the river.

*938 In 1878 an official survey was made of T. 9 S., R. 22 E.,[4] SBM, showing that by 1878 the Colorado River had migrated westward into T. 9 S., R. 21 E., SBM, in the vicinity of sections 12 and 13, which had been surveyed in 1857. By then the river had submerged most of Tract H and part of Tract G of the property in suit, as designated in the foregoing diagram. The 1878 survey was adopted by the Surveyor General and filed in 1879.
In 1902 an official survey of T. 1 N., R. 24 E., Gila & Salt River meridian (hereafter G&SRM), in Arizona, showed fractional sections 24, 25 and 26 bordering the Arizona side (left bank) of the river and facing sections 12 and 13, T. 9 S., R. 21 E., SBM, across the river. The Colorado River as it existed in 1902 was the western limit of this survey.
On January 31,1903, the Secretary of the Interior directed a temporary reclamation withdrawal of all lands in Arizona lying within 6 miles of the Colorado River west of the 114th meridian, precluding such withdrawn lands from “settlement, entry or other form of disposition under the public land laws except the homestead laws.” (Emphasis added.) Presumably, the withdrawal still obtains, there being no record evidence to the contrary. The patented lands in dispute fell within the exception.
Homestead entries were made in Tracts C and D by Smith in 1910 (patented in 1913), in Tracts E, P, G and H by Graham in 1914 (patented in 1921), and in Tracts A and B by Board in 1919 and 1920 (patented in 1923). The present plaintiffs are their successors in interest from 1952 and thereafter (see finding 16, infra). The homestead entries and patents, based upon the 1857 survey, all described the property by reference to the SBM, California. Finding 13, infra, describes the position of the river in relation to the patented tracts at the time or times they were entered and/or patented. The entries were m'ade and the patents issued. On both occasions (i.e., entry and patent), Tracts C and D lay on the west (California) side of the river. Tracts E, F, G and H collectively straddled both sides of the river, both at the time *939 of homestead entry in 1914 and patent issuance in 1921. The river bisected the patent. Tracts A and B were apparently riparian to the west (California) bank of the river at time of entry in 1919, and by the time of patent issuance in 1923 that part of Tracts A and B not in the bed of the river was riparian to its California bank.
With minor deviations and reversals, the river in the area relevant hereto moved generally northwestward from 1857 to 1964. The defendant contends that all of these movements were slow and imperceptible (accretive) in character, and the plaintiffs agree except as to the radical change between 1912 and 1914, which they say was sudden or avulsive. Findings 12(c) (5) and 13, mfm, conclude, on the basis of conflicting evidence, that the 1912-14 shift in the river was avulsive. If avulsive, of course, then the sudden relocation of the avulted stream channel westward would not only have left private land boundaries undisturbed for title purposes, but would have constituted the deserted channel as the proper state boundary, thus at that point placing California land on the east side of the actual river channel.
There is a certain subjective exercise implicit in the determination of When a river movement is accretive or avulsive in a time-distance sense. There is a tendency to pronounce as accretive even substantial river movements over a relatively short period of time on the theory that the imperceptibility hallmark of an accretive change means a deposit of alluvion that is imperceptible while it is happening on a daily basis, even though it may be most perceptible from one period to a not-so-distant period. In the present case it was typical for the change to occur under a blanket of floodwater crossing the plain during the annual wet season, so that when the flood receded the channel would appear in a different location. At least until the closing of the Hoover and Parker Dams in 1935 and 1938, Which tended to stabilize the river channel by controlling the release of floodwaters and by clarifying the water so ¡released by trapping its sediment load and increasing its channel scouring effect, the position of the river channel because of the annual flooding with heavily sedimented water was rather fluid. The conclusion reached is not in contradic *940 tion to United States v. Claridge, 416 F. 2d 933 (9th Cir.1969), which, in sustaining the count below (279 F. Supp. 87 (D. Ariz. 1967)), found that changes in the course of the Colorado Biver at another location in the Palo Verde Valley-resulted from erosion rather than avulsion. Different factors and different parties were involved.
According to almost universal western law of the last two millennia, which is rooted in the English common law and, before that, the Boman law, an avulsion does not disturb title to property riparian to a navigable stream, but extinguishes — 'transiently only — use of or title to that subaqueous portion coming to rest in the bed of the avulted stream. Similarly as to state boundaries. Arkansas v. Tennessee, 246 U.S. 158 (1918); Anderson-Tully Co. v. Franklin, 307 F. Supp. 539 (N.D. Miss. 1969). Gontrarily, when a river moves by the process of accretion, which is slow and imperceptible, riparian owners gain or lose title to the accreted or eroded portions as the case may be. Jefferis v. East Omaha Land Co., 134 U.S. 178 (1890). We may quarrel with the propriety of this time-honored legal consequence when, regardless of a river’s movements, the original boundaries of property may at all times be fixed and determinable, whether the migration be slow or swift, but the principle is too firmly imbedded, at least in Federal jurisprudence, to challenge, even though adherence to the rule may often have the undesirable consequence of promoting instability in title to riparian land and converting such investments into a huge game of chance.
The reputed justifications for this land law oddity are various. Some authorities, among them Blackstone, rely on the theory of de minimis non curat lex because the gain or loss should be minor (even where it is sometimes not). Others offer the sporting proposition that the chance of gain is matched by the chance of loss, and that he who acquires riparian land accepts its evanescence. Still others justify it on the importance of continued access to the waterfront, or the traditional concept of a river as a natural boundary, or the inducement thereby afforded to put accreted land to cultivation and improvement. These alternatives are thoughtfully explored in Beck, The Wandering Missouri River: A Study in Acere *941 tion Law, 43 N.D. L. Rev. 429 (1966-67). Inflexible application of the doctrine relating to accretion and erosion may tend to ease administration problems at the expense of equitable treatment of riparian owners. If the boundaries of fee property adjacent to an unstable river are at all times fixed and capable of ready identification, one sees little purpose in these times to subjecting the fee to the vagaries of the river. But that is not the Federal law to date.
Be that as it may, strict application of the accepted rules of accretion, erosion, and avulsion to the mosaic of eight tracts involved in this proceeding, as traced change by change of the river in finding 14, infra, without any reference to other legal and equitable considerations present in this case, produces the ineluctable conclusion (finding 14 (i), infra) that by 1965 the only portions of the total 320 acres then remaining in rightful private ownership were Tract E, most of Tract B, and about 28 acres of Tract G, not to mention 52 acres of Tracts G and H which the United States had condemned in 1964 for a channelization project under a claim of. right and had paid a token $1 as just compensation for any adverse interest therein.[5] In addition, except for their failure to timely assert the right, the plaintiffs had gained by accretion that portion of public land lying between the west boundary of Tract E and the left (east) bank of the 1952 position of the river whose thread became the permanent interstate 'boundary by the 1964 compact.[6]
All the rest of the property had either accreted to public lands or was submerged in the stabilized pre-1964 stream bed and thus became the property of the adj oining states. Interestingly enough, these legal consequences would pertain in 1965 whether the disputed 1912-14 shift in the river were to be classified as either avulsive or accretive. This is so because, if *942 the change in the position of the river from 1902 to 1914 were by gradual accretion, as the defendant asserts, then as of Graham’s homestead entry in May 1914 into Tracts E, F, G, and H, by extrapolation at least an eastern portion of his homestead entry acreage would be east of the river on the Arizona side, enough to give him a 'left bank toehold as a base for accretive additions thereto as the river crept further west.[7] The identity of ultimate title consequences in 1965 renders moot what seemed at first to be a difficult factual dispute to resolve as to whether the 1914 position of the river resulted from avulsion or accretion. Quite evidently it makes no difference.
Thus far we have discussed only the bare legal rights of the plaintiffs flowing from the orthodox operation of accre-tive and avulsive principles.[8] Other considerations have been presented by the parties, drawn either from case law or the special dispensations contained in the originating Senate Resolution, which may affect results in further ways. One of these factors rests on the case of United States v. 62.57 Acres of Land in Yuma County, Arizona, Fort Yuma Land and Investment, Inc., 449 F. 2d 5 (9th Cir.1971) (hereinafter the Fort Yuma case), upon which the plaintiffs rely heavily and which the defendant’s brief ignores.
*943 In a sense, the foregoing discussion has utilized the holding set forth in Fort Yuma. However, at this point it is useful to delineate what that holding was and to point out specifically how it applies to the facts of this case. In Fort Yuma at the time of issuance of patents to homestead land, portions described therein were located on both the Arizona and California sides of the bisecting Colorado River, but the river thereafter accreted eastward so as to place all of the property on the California side. This is a mirror reverse of our plaintiffs’ factual situation, and in fact involves property only a few miles north of the property in suit.
The fact that the legal description in the patents covered nonriparian land on the east side of the river and was subject to surveys controlled by the G&SRM solely located in Arizona was held in the Fort Yuma case not to preclude the patents from conveying land on the California side of the river controlled by SBM coordinates after the river changed its location. Nor did the fact that, between the date of homestead entry and the issuance of patents, the land for which the patent was sought was described by Arizona rather than California coordinates make the patent invalid or ineffective where its exact location could be shown and was established by fact of actual entry. “ [I] f the boundaries of the parcel can be located on the ground either by the legal description in the instrument, or from information contained in the deed, the instrument is adequate. * * * The same rule applies both in Arizona and California, [citations.]” [449 F. 2d at 10-11.][9]
In reaching these conclusions validating the plaintiffs’ initial title to the patented land, the court recognized that generally when a patent issues, the legal title thus acquired relates back to the date of entry and rights are established as of the earlier date (which would have deprived the Fort Yuma claimants of accretive benefits), but held that, since the relation back doctrine was a legal fiction designed to pro *944 mote justice, it would better serve justice under the circumstances existing to recognize the date of patent issuance as the controlling date to determine the rights of the claimants. The court interpreted United States v. Detroit Timber and Lumber Co., 200 U.S. 321, 334-35 (1906), to hold that the relation back doctrine was designed to cut off the rights of intervening claimants, and inferred that it has no application as between a grantor and grantee to alter the obligation to convey land as called for in the entry and patent. Beaver v. United States, 350 F. 2d 4 (9th Cir.1965), cert. denied 383 U.S. 937 (1966), relied on by defendant here, was distinguished because in Bearer all of the land was in Arizona at the time of the patent, whereas in Fort Yuma at the time of the patent the river split the property, leaving a portion on the California side to be augmented by accretions as the river moved toward the east.
Significantly, the closing comment in the Fort Yuma opinion was that “Once the patent issued the patentee would be subject to the rules of accretion and erosion.” 449 F. 2d at 11. Thus the Fort Yuma case does no violence to the traditional rules regarding accretion and erosion, but in effect merely validates the boundaries of land patents as described therein, regardless of what might be considered technical deficiencies in the descriptive references, so long as there is no question as to the land being conveyed or its precise location.
The case under consideration presents a problem comparable to the Fort Yuma case, that is, the effect of a patent grant described by reference to a meridian applicable to one state which overlaps a meridian in an adjoining state, so that the same land carries two different descriptions. The plaintiffs’ brief suggests the following rule of law, which we approve, drawn largely from the Fort Yuma opinion and cases cited therein, and adapted to present facts: “Where the land patented can be located by the official government survey (plat) which the original application for the land expressly or impliedly had reference to, the patent cannot be defeated because of an overlapping survey, particularly (1) where the government has conveyed no conflicting grants under the overlapping survey; and (2) where the overlapping survey *945 was subsequent to the survey the applicant claimed under.” This rule, of course, would not defeat the normal operation of the rules of accretion occurring after the patent grants, as per the caveat at the end of the Fort Yuma decision. It is not contended here that the patent descriptions referring to the SBM were in error, since in fact at that time and until a resurvey in 1962 under the G&SRM, no other description of the lands in suit was available. The location, extent, and boundaries of the patents were at all times fixed and determinable and were public lands subject to no prior conflicting grants, regardless of what side of the river they may have been on at the time.
In opposition to this phase of plaintiffs’ contentions, the defendant maintains that surveys and grants of the United States do not extend beyond the limits of navigable watercourses, so that a patent purporting to grant land in California could not pass title to part of the land which happened to be across the boundary river in Arizona. The cases cited by defendant to support this proposition do not do so. Mann v. Tacoma Land Co., 153 U.S. 273 (1894), holds principally that the United States cannot grant patents to tidelands which belong to the state. Barney v. Keokuk, 94 U.S. 324 (1876), precludes the United States from extending its surveys and patent grants beyond the limits of high water, meaning the beds and shores of navigable waters which are in the states. While Anderson-Tully v. Franklin, supra, 307 F. Supp. at 547, states that “(W)hen land along a navigable stream is washed away by the gradual action of the river, the land call is forever washed away, and a conveyance by such description thereafter is ineffective,” in the context of its particular facts it represented the simple legal tautology that a nonavulsive erosion of riparian land diminishes the fee. None of these propositions is to be controverted.
The patents in dispute here nowhere mention the Colorado River as a boundary water, nor do they purport to convey interests in the bed of the stream, but merely convey public land whose described boundaries lay in part (the Graham patents to Tracts E, F, G and TI) on both sides of the river, while Tracts C and D in the Smith patent in 1913 were not *946 then riparian, and that part of the Board patent to Tracts A and B in 1923 that was not riparian to the west hank of the river at the time was in the stream bed. No claim is made by plaintiffs that the portions of the patents which were submerged in the river passed with the grants or did not constitute state property while so submerged, subject to change of ownership by accretion when the subaqueous land emerged as the river moved. Furthermore, the Fort Yuma case, supra, effectively disposes of the defendant’s contention misapprehended from the cited cases it relies on.
The equitable considerations are yet to be addressed under the terms of Senate Resolution 143, which directs the Chief Commissioner to advise whether a waiver and relinquishment of Government title to any of the lands in dispute would be appropriate from an equitable standpoint were the Government in the shoes of a private individual urging its defenses to plaintiffs’ claim of title rather than in sovereign attire. Specifically, we are to consider first in this equitable connection the age of any accretion claim by the United States (this would particularly apply to Tracts A, C, D and F which our analysis in finding 14(i), infra, shows accreted to the public lands).
Basically, the Government never had even a colorable accretion claim to Tracts B, E, G and H, because at the time the patent issued in 1921 to Graham for Tracts G and H they were entirely on the east bank of the river, and in the course of the gradual westward migration of the river to 1965, Tracts E and B accreted to G and H, except for the southeast corner of Tract B, which was in the river in 1965.
The Government’s accretion claim to Tracts C and B would have first accrued sometime between the 1917 and 1923 ascertainable river positions, when the bulk of these tracts emerged from the river and accreted to public lands on the east bank thereof. For convenience, we shall extrapolate a midway date of 1920 for the accrual date of the Government’s accretion claim to Tracts C and B.
The Government’s accretion claim to Tract A first accrued about 1936 (extrapolated as midway between known river positions in 1930 and 1942), when the eastern half of the tract *947 emerged from the left bank of the relocated river and accreted to Tract D, which by then had become public land by accretion to original public land, as stated above.
Finding 14, infra, establishes that Tract F was mostly submerged in the river at the time the patent therefor was issued to Graham in 1921, so since the survey in 1923 shows that an eastern wedge of the tract had emerged by then east of the river accreted to public land, 1923 is the approximate date that the Government’s accretion claim to Tract F began to accrue.
The net result, then, is that the Government’s accretion claim to Tracts C and D accrued in 1920, to Tract A accrued in 1936, and to Tract F accrued in 1923. Since the first categorical assertion of record by the Government of title to these tracts (except Tracts G and H) was the filing of its answer in these proceedings in 1971, it appears that the Government delayed 51 years as to Tracts C and D, 35 years as to Tract A and 48 years as to Tract F. Even if we were to reduce these delay periods by 7 years on the theory that the filing by the Government in 1964 of a suit to condemn 52 acres of Tracts G and H constituted assertion of a claim to title by accretion of all eight tracts, the delay periods would become, respectively, 44 years, 28 years, and 40 years. We do not construe the 1964 condemnation suit to have constituted such an assertion by the Government of title to all eight tracts.
As another equitable consideration under the mantle of the Senate Eesolution, the plaintiffs contend that if the Government were to be regarded as a private litigant defending the present claim (as the Eesolution postulates), the provisions of the Arizona and California Codes concerning adverse possession would preclude the defense of paramount title raised here. If the 1914 position of the river was occasioned by an avulsion, then the disputed tracts would have remained in California until the Interstate Boundary Compact of 1964 decreed otherwise, since in such case the 1912 river channel which ran east of the tracts would have remained the interstate boundary even when the river avulted westward.[10] This *948 has been previously discussed. In any case, it is unnecessary to engage in a choice-of-law discussion since, whether the California or Arizona provisions respecting adverse possession be applied, the result in this case is the same.
The California Code provides essentially that one in adverse possession of land for 5 years acquires a fee simple title to the land so held. Sections 322-26 of the California Code of Civil Procedure set forth the variously applicable criteria with respect to adverse possession. The plaintiffs’ possession comes within the criteria of both sections 322 and 323, because the plaintiffs entered into possession of the property under claim of title, exclusive of any other right, their claim was founded upon a written instrument, and there has been a continued occupation and possession of the property included in such instrument for a period of at least 5 years. As used above, and in section 322, land is deemed to have been possessed or occupied when, inter alia, “[X]t has been usually cultivated or improved * * * [or] [w]here * * * it has been used * * * for the ordinary use of the occupant * * California Code of Civil Procedure, § 323.
Section 12-526 of the Arizona Eevised Statutes provides that an action to recover lands from a person who has had peaceable and adverse possession, cultivating, using and enjoying it, shall be commenced within 10 years from the accrual of such cause of action. The period is reduced to 3 years where the occupancy is under color of title (A.E.S. § 12-523), and to 5 years where the occupant has paid taxes for that period and is claiming under a duly recorded deed (A.E.S.§ 12-525).
Therefore, under either the California or the Arizona statutes referred to, the plaintiffs have more than met their adverse possession burden. They and their predecessors in title have, since the issuance of patents, occupied and improved the land for agricultural purposes, paid their state and local real estate taxes, and paid their Irrigation District water assessments for far in excess of the minimum statutory requirements.
The defendant states that the Color of Title Act (43 U.S.C. § 1068, et seg.) affords the plaintiffs no support. The Act *949 authorizes the Secretary of the Interior to issue a patent to land which, for more than 20 years, a claimant or his predecessors in interest have occupied under claim or color of title adversely to all others, and has improved or cultivated. It was discussed in Beaver v. United States, supra, 350 F. 2d at 9-10. However, the plaintiffs are not relying on that statute, nor is it designed to apply to this situation, for here plaintiffs are claiming under original patents issued many years ago, while the Color of Title Act authorizes the issuance of a patent after 20 years of continuous occupancy and use. Also, the plaintiffs here rely on state statutes of adverse possession, as Senate Resolution 143 permits them to do for the purposes of this proceeding, and the Federal Color of Title Act has nothing to do with the problem.
The plaintiffs propose in Part IV of their brief that the Government is prevented by the statute of limitations specifically imposed on the Government by 43 U.S.C. § 1166 from attacking the patents in this case on the grounds of mistake of the patents. It is not necessary to pass upon this contention because of disposition on other grounds. While the object of the statute is to extinguish any right the Government may have in the land and vest a perfect title in the adverse holder after 6 years from date of patent, regardless of any mistake or error in the land department or fraud or imposition of the patentee (United States v. Winona and St. Peter R.R. Co., 165 U.S. 463 (1897)), it would not seem that the statute is intended to deprive the Government of whatever benefits inure to it from accretion to public land of eroded private land caused by river movements. The statute would seem to aim at the circumstances of patent issuance rather than at fee-affecting developments subsequent to that date, such as accretive changes. Were the statute to apply, it is clear that the Government’s delay in formally asserting claims to the accreted additions to public lands for vastly more than 6 years from the accrual of such claims would confirm plaintiffs’ title today. But we expressly do not resolve this issue.
It may also be superfluous to comment on the plaintiffs’ final point that had these plaintiffs not been eliminated from Pub. L. 91-505 (84 Stat. 1106), which was enacted to permit cer *950 tain landowners upstream one mile from plaintiffs to assert their title claims against the United States in a judicial forum without the defense of sovereign immunity, the plaintiffs could then have brought suit against the Government in a court of appropriate jurisdiction after first satisfying six prerequisites specified in the statute. We are not informed as to the existence or the consequences of any litigation brought pursuant to Pub. L. 91-505 by the property claimants to which it pertained, nor do we know the facts involved as to those claimants so as to equate them accurately to the facts governing the present plaintiffs’ claims. However, Senate Resolution 143, by whose terms we are bound, omits reference to Pub. L. 91-505 as a basis for equitable consideration of the present plaintiffs’ claims, nor, as it turns out, do the plaintiffs need such assistance since they prevail on those considerations expressed by the Resolution as coming within our prescribed duties.
In summary, it is recommended to the Senate that the plaintiffs are equitably entitled to legislative redress similar in form to S. 1343, 91st Cong., 1st Sess., revised to provide monetary relief or relief in kind as to the 52 acres of their property previously condemned and utilized by the Government for a rechannelization project, but with a relinquishment and disclaimer by the United States of all of the rest of the 320-acre area involved in this proceeding, except as to that portion which may be submerged in the bed of the Colorado River.
FindiNGS or Fact
1. By Senate Resolution 143, 91st Cong., 1st Sess., S. 1343 entitled, “A Bill to relinquish and disclaim any title to certain lands situate in Yuma County, Arizona” was referred to the Chief Commissioner of the United States Court of Claims. The text of S. Res. 143 is as follows:
Whereas there is pending in the Senate of the United States a bill designated as S. 1343, to waive and relinquish any claim of title which the United States of America may have in and to certain lands situated in the county of Yuma, State of Arizona, as to which the Senate desires the investigation, findings and conclusions hereinafter referred to: It is hereby
*951 Resolved, That said bill be referred to the Chief Commissioner of the United States Court of Claims as authorized by section 1492 of title 28 of the United States Code for a report in conformity with section 2509 of title 28 of the United States Code with findings of fact and conclusions sufficient to inform Congress whether the waiver and relinquishment of any claim of title by the United States is appropriate in light of any legal or equitable claim to the real property described therein, or any part thereof, by private claimants, including findings as to the age of any accretion claim which the United States might have in and to any part of the subject lands and whether or not there would presently exist any legal or equitable defenses to the assertion of any such accretion claim had it accrued to and were now asserted by a private party rather than to the sovereign; such report shall not take account of, or be in any way affected by, the fact of any pending litigation in any forum or tribunal or any pending administrative proceedings.
2. The text of S. 1343 is as follows:
Be it enacted by the Senate and House of Representatives of the United States of America in. Congress assembled, That the United States of America does hereby relinquish and 'disclaim any right, title, or interest which it may have in and to that certain real property situate in Yuma County, Arizona, within the boundaries of the east one-'half of the northwest quarter and the north one-half of the northeast quarter and the northwest quarter of the northwest quarter of section 13; and the northeast quarter of the southwest quarter and the south one-half of the southwest quarter of section 12, township 9 south, range 21 east, San Bernardino meridian as depicted by the original plat of survey of such township published by the United States Surveyor General Office, dated March 21,1857, being a portion of sections 23, 25, and 26, township 1 north, range 24 west, Gila and Salt Eiver meridian as depicted by the dependent resurvey and accretion survey plat of said township published by the United States Department of the Interior, Bureau of Land Management, dated June 5, 1962.
3. The Colorado Eiver is a navigable, highly unstable alluvial stream. In 1964 a loop in the natural channel of the river was shortened by an artificial channel constructed by the Government which curves generally east of the property *952 in suit and cuts off 52 easternmost acres thereof. (See finding 18, infra.) However, the natural superseded channel rather than the artificial channel is the boundary between Arizona and California pursuant to the Arizona-California Boundary Compact (Arizona Revised Statutes, section 41-522, approved by Congress on August 11,1966, 80 Stat. 340). (See finding 19, infra.)
4. In its natural state the Colorado River meandered through the valley where situated. In the area in question there are high bluffs 2 to 6 miles apart which confine the river during extreme flood stage within the limits of those bluffs. The Colorado River has during its existence flowed to all points across this relatively narrow valley. In a state of nature an alluvial stream constructs its own levee. Such a natural levee is quite broad and gentle in slope and is built during times of relatively high flow when the silt-bearing water washes over the stream banks and slows down in the quiet recesses along the edge of the stream depositing its silt load. Through a process of many years, the stream builds up its bed and natural levee to a point where the bed and levee are higher than the valley floor thus creating a hydraulic imbalance. In the area in question, the Arizona side of the valley was slightly higher than the California side at the time of the entries and patents here involved.
5. In a state of nature a stream flowing through an alluvial valley carries silt, picking up silt at one point and depositing it at another. The river does not flow in a straight line through a gently sloping or relatively level terrain because of the effect of gravity and the movement of the earth on its axis. The force of gravity pulls the river to the lowest elevation and the influence of the movement of the earth on its axis creates a vortex which in the northern hemisphere causes the river to attack and eat away at the right (facing downstream) bank. As the river tends to attack and eat away at the right bank, it reaches a point where the pull of gravity compensates and the stream is deflected back to the other bank, thus creating a sinuous or meandering pattern. After the original pattern of the stream is created in which it has reached its most level (and therefore most sinuous) configuration and secured *953 the best balance for the releases of its energy, it tends to enlarge the curve by eroding the banks on the outside of each curve and depositing the alluvium on the inside of the next succeeding curve downstream. During times of high flow the energy of the stream is increased and the force of its movements is accentuated, thus eroding banks faster and enlarging the sweep of curves somewhat. At times of continued high flows the river will, in an effort to shorten its course, avult through the neck of one or more of its tightly meandered loops 'into a new channel which thus bypasses the truncated loop.
6. This natural process was in progress at all times on the Colorado Biver and certainly subsequent to the original survey of 1857, and prior to the time that the patents here-' inafter referred to were issued to Smith, Graham, and Board. While the river tended generally to move its position in a westerly direction during this century, there have been prior occasions, such as demonstrated by an 1879 survey map, when it has moved in an easterly direction. The survey of 1902 depicts the location of one of the channels of the Colorado Biver as closely approaching the southeast corner of section 12 and the main part of the stream as crossing the southeast quarter of section 13, township 9 south, range 21 east, San Bernardino meridian.
7. In a state of nature the Colorado Biver was subject to extreme floods which lasted generally from May through July. These floods disturbed the farmers who attempted to cultivate land near the banks of the river and in fact throughout the valley since the land was so level. The farmers in the valley formed irrigation districts to build levees to protect the lands within the districts during flood periods and to pump and deliver irrigation water during the dry seasons of the year. The Federal Government completed Hoover Dam upstream on the Colorado Biver in 1936 and Parker Dam in 1938, thereby controlling the large floods and also insuring a better supply of irrigation water in dry seasons. They tended to trap sediment and thereby reduce the sediment delivered downstream, as well as to scour the downstream channels more than heavily sedimented water would tend to do. How *954 ever, the silt-trapping and backwater effect of dams far downstream produced siltation consequences at the property in suit. Witness the fact that the stream had aggraded about 8 feet from 1903 to 1952 in the vicinity Of subject property.
8. David E. Smith made an application for a homestead entry on the east half of the west half of section 12 of township 9 south, range 21 east, San Bernardino meridian, California, on May 18,1910. Final proof of the homestead entry was made in August 1912. Smith had cultivated ¡about 2y2 acres in 1911 and about an acre in 1912. He cleared a total of about 5% acres. In answer to a question about absence from the property, he referred to watching the levees, fearing they would break. A patent issued for the east half of the northwest quarter and the east half of the southwest quarter of section 12, township 9 south, range 21 east, San Bernardino meridian, California, containing 160 acres, to David Smith, dated February 14, 1913. We are not concerned in this suit with the east half of the northwest quarter of section 12. The property was described in the patent as being in 'California because until 1962 there was no way to describe the property except by reference to San Bernardino meridian coordinates based on the original survey of 1857.
9. (a) On May 2, 1914, Joseph F. Graham applied for a homestead entry on the north half of the northeast quarter and the east half northwest quarter, section 13, township 9 south, range 21 east, San Bernardino meridian, California. Final proof was offered by Graham in 1919 wherein he stated in answer to question 9:
We were never absent from the claim until about May, 1917, when the Fiver came in and took the land where my house was. Then I went to live on my desert claim.
In recommending issuance of the patent on March 24,1920, the special agent stated among other things:
The entryman says he cultivated about 12 acres in 1914, and about 19 in 1915, and because of high waters in the summer periods he was prevented from further cultivation thereafter.
The river channel now covers all the entry except about 8 acres on the SE^NW^ and this area is covered with a thick growth of willows and other brush, and as the *955 area which remained was so small the claimant says he did not feel justified in attempting further to cultivate it until after the Palo Verde Joint Levee now under construction may have been completed. After the injuries were sustained upon the homestead in.1917 the entryman moved upon his desert entry embracing the W%SW% Sec. 23, T. 9 S., R. 21 E., and has Tesided there since.
In as much as the entryman was prevented from completing his residence and cultivation by conditions over which he had no control, it is recommended that final certificate and patent issue.
(b) A patent issued for the north half of the northeast quarter and the east half of the northwest quarter of section 13, township 9 south, range 21 east of the San Bernardino meridian, California, to Graham on October 21,1921. Since about 1914 the easternmost portions of Graham’s patent have been situated on the left bank of the river, which is the Arizona side. At the time of issuance of Graham’s patent a large portion of his property was on the Arizona side of the river, although the patent described it according to the San Ber-nardino meridian, which governed lands in California.
10. (a) On February 28,1919, Frank Board applied for a patent on the southwest quarter of the southwest quarter of section 12, township 9 south, range 21 east, San Bernardino meridian, California, containing 40 acres. Later, on April 30, 1920, Frank Board made application for an additional homestead entry on the east half of the northeast quarter of section 14 and the ¡northwest quarter of the northwest quarter of section 13 in township 9 south, range 21 east, San Bernardino meridian, California, containing 120 acres. We are not concerned in this suit with the east half of the northeast quarter of section 14. When Board presented final proof of entry on May 9, 1923, he stated that in 1919, of the lands which he homesteaded, he cultivated 1% acres; in 1920, he cultivated 6% acres; in 1921, he cultivated 18 acres; in 1922, he cultivated 25% acres and in 1923, he could not plant until after the overflow of the Colorado River had receded. One of the witnesses called to help establish his proof of work for a homestead entry was a Mr. Zalkovsky. On May 11,1923, Zalkovsky wrote to the United States Land Office of El Centro, California, and stated in part that half or more of Board’s 40 acres of section *956 12 was in tbe river. Board was only applying for 40 acres in section 12 in 1923.
(b) A patent issued for the southwest quarter of the southwest quarter of section 12, the northwest quarter of the northwest quarter of section 13 and the east half of the northeast quarter of section 14, township 9 south, range 21 east of the San Bernardino meridian, California, containing 160 acres, to Frank W. Board on August 22, 1923. By 1923 the altered course of the river flowed diagonally across and submerged the eastern part of Board’s patented lands, leaving the rest on the California side of the river boundary until 1942, when a westward shift in the river situated the nonsubmerged part on the Arizona side of the river boundary.
11. The location of the lands involved in this suit which were patented to Smith, Graham and Board, as described in findings 8, 9, and 10, respectively, supra, are plotted in a sketch in the accompanying opinion in relation to fluctuating configurations and locations of the Colorado Eiver from 1879 to 1952, and with reference to the California-Arizona Boundary Compact of 1964, as well as the location of the river re-channelization project in 1964. For ease of reference in discussing the movements of the river over the years in relation to the subject properties the sketch mentioned arbitrarily assigns alphabetical designations to Tracts A and B (the Board patent), Tracts C and D (the Smith patent), and Tracts E, F, G and H (the Graham patent). Hereafter the patents and portions thereof will be referred to as Tract A, B, etc., rather than by their confusing and cumbersome technical nomenclature. As the sketch indicates, however, Tracts A, C and D are (or were) in section 12, and Tracts B, E, F, G and H are (or were) in section 13.
12. (a) The present system for surveying public lands in the United States, adopted in 1785 and attributed to Thomas Jefferson, is based upon the division of the entire country (with certain exceptions such as the State of Texas and the “colonial” states in the East, where there are no Federal public lands subject to survey) into a grid of 6-mile square rectangles, called townships, each containing 36 rectangular sections, with each section being 1-mile square and comprising 640 acres. The townships are referenced to a series of some *957 36 precisely located and marked meridian lines and base lines distributed throughout the country which govern the areas in which they are established. Each of the meridian lines parallels longitudinal lines, and is crossed at right angles by a base line which is parallel to the lines of latitude. Because of the gradual convergence of the meridians occasioned by the curvature of the earth, slight imperfections resulting in the rectangularity of each township and section are substantially compensated for by spaced corrections to the meridian lines. The system is described in a pamphlet “Surveying Our Public Lands” published in 1969 by the Bureau of Land Management, Department of the Interior.
(b) For our purposes the San Bernardino meridian and its perpendicular base line was established in 1852 and divide southern California into quadrants. The Gila & Salt River meridian and its base line were established in 1865 and divide the present State of Arizona into quadrants. The inner end of each of these two base lines terminates at the Colorado River, which was until the ratification of the boundary compact in 1966, the boundary between southern California and Arizona, and which also marks the termination point of the territories covered by the San Bernardino meridian and the Gila & Salt River meridian. Herein the descriptive suffixes SBM and G&SRM will represent abbreviations for the San Bernardino meridian and the Gila & Salt River meridian, respectively. Illustratively, the abbreviation NE^SW[1]/^, Sec. 12, T. 9 S., R. 21 E., SBM represents the northeast quarter of the southwest quarter of section 12, township 9 south, range 21 east, San Bernardino meridian.
(c) The various positions of the river in the years from 1857 to 1964 in relation to the property in suit are shown in a series of surveys, maps, and aerial photographs, viz:
(1) 1857: The original survey in 1855-56, approved by the United States Surveyor General’s Office on March 21, 1857, of T. 9 S., R. 21 E., SBM, places the river substantially to the east of the property in suit at that time. The properties were not then riparian to the river, and were wholly within California.
(2) 1879: A survey made in 1878 of T. 9 S., R. 22 E., SBM, approved by the United States Surveyor General for Cali *958 fornia in 1879, shows the river to have moved westward since 1857 and to be running through and submerging most of Tract H and part of Tract G (references are to the sketch in the accompanying opinion), leaving the balance of the property in suit on the California side of the river.
(3) 1902: A survey made in 1902 of fractional T. 1 S., E. 23 W., G&SEM, approved by the Surveyor General in 1904, shows a change in the course of the river which, from a different direction than in 1879, flows through and submerges over half of Tract H, but leaves the balance of the subject property on the California side of the river. The lands on the left (Arizona) bank of the river were identified as incomplete or fractional sections 24,25 and 26 of township 9 in Arizona.
(4) 1902-03: A United States Geological Survey made in 1902 of fractional T. 1N., E. 23 E., G&SEM, shows the main channel of the river to have moved east of the subject property, but with a small feeder channel parallel to the main channel bisecting Tract H diagonally from right to left, and bisecting the southeast corner of Tract F.
(5) 1912: (i) In March 1912 the Palo Verde Mutual Water Company (the Irrigation District), under the signature of its Chief Engineer Chas. J. Berg, published a map of the Palo Verde Valley, Imperial and Eiverside Counties, California, purportedly compiled from the water company’s surveys in 1911-12. This map shows the river almost touching Tract H of the subject property in its southwesterly course across section 13 (see sketch in opinion), and places all of the subject property at that time on the California side of the river. The 1912 Berg map bears such close resemblances to the 1902 and 1902-03 survey maps {swpra, pars. (3) and (4)) in depicting the shape and course of the Colorado Eiver in the vicinity of the subject property that, although it has 'been relied upon for many years by the engineer authorities and in litigation as correctly reflecting the 1911-12 conditions, the defendant’s highly qualified expert witness testified at the trial of this case that the course depicted for the river is obviously copied from the 1902 and 1902-03 maps rather than being drawn from a fresh survey. Although the lack of change in the river shape and location in its reaches *959 parallel to the subject property between 1902 and 1912 as reflected by the maps for those years would be inconsistent with the record of constant fluctuations in the river locations in all recorded periods prior to 1902 and subsequent to 1912, to believe that Chief Engineer Berg merely copied part of his 1912 map from the 1902 map instead of making an independent survey would itself be inconsistent with the purpose of the 1912 map, namely, to determine where to locate flood levees on the river.
(ii) The significance of the issue is that the radical change in the location of the river by 1914 as shown by a map for that year (par. (6), infra) in contrast with Berg’s 1912 map, would suggest an avulsive change if it had occurred in the brief interlude since the 1912 Berg survey, but if in fact the change by 1914 had occurred gradually since 1902, then the change would have been accretive in nature rather than avulsive. The dispute bears on the question of title in this case, as the accompanying opinion explains. With some mental reservations, it is concluded that the defendant has failed to discredit or overcome by convincing proof the presumption of validity which attaches to the Berg map of 1912 by reason of its wide professional and judicial acceptance over a long span of years.
(6) 19:4-* In June 1914 Yuma County, Arizona, under the signature of its Chief Engineer, C. H. Clarke, published a map of the Cibola Valley in Arizona showing a proposed irrigation system and levees on the Colorado River above, below, and past the subject properties. At the latter location the position of the river had by 1914 shifted radically from that shown by the Berg map for 1912, as described in paragraph (5) of this finding. In 1914 the river is shown to be running through and submerging approximately the east half of Tracts C, D, E and F, leaving Tracts A, B, and the west half of Tracts C, D, E and F on the California side of the river, and all of Tracts G and H on the Arizona side. The relative locations of the river in 1912 and 1914 with relation to subject properties are shown in graphic juxtaposition in plaintiffs’ exhibit 15b.
(7) 1917: A map of the Palo Verde Valley in California *960 compiled by Construction Engineer J. C. Allison in October 1917 for the Palo Verde Joint Levee District to depict the boundaries of the Irrigation District and a proposed levee, shows that by 1917 the river was in roughly its 1914 position in relation to the subject properties except that it had broadened somewhat so as to flow through and submerge the western third of Tract G. The rest of Tract G and all of Tract H were then on the Arizona side of the river, and Tracts A, B, and the west half of Tracts C, D, E and F remained on the California side.
(8) 1923: A ground water map compiled by the Palo Verde Irrigation District of California under date of December 26, 1923, depicts a further change in the position of the river since 1917 that is difficult to describe by text, but which represented a westward movement which placed more of the subject properties on the Arizona side of the river and left less remaining on the California side. By 1923 one leg of an elongated loop of the river entered the northern edge of Tract A in a south-southeasterly direction and exited at the southeast comer of Tract F. Thus, it then flowed across and submerged parts of Tracts A, B, D, E and F, leaving parts of Tracts A, B and F on the California side of the river and placing all of Tracts C, G and H, and part of Tracts D, E and F on the Arizona side.
(9) 192¡¡,: According to another map compiled by the Palo Verde Irrigation District of California on March 15, 1924, by then the main channel of the river had remained in roughly the same position as in 1923, but in the meantime several small channels were flowing across and connecting both legs of the neck of the river loop so as to submerge larger areas of the subject properties than in 1923.
(10) 1930: An aerial photograph mosaic of the general area prepared in June 1930 (in the middle of the annual flood season) shows that the braided loop pattern existing in 1924 had by 1930 consolidated into a large body of water submerging most of the subject properties, and leaving only portions of Tracts A and B, and a small corner of Tract F, on the California side of the river, and most of Tract H on the Arizona side. An artificial cut (Keele Cut) made in 1930 *961 connecting the loop in question with the top of the next upriver meander bend (apparently in order to induce a shortening of the river at that location) contributed to the inundation of the subject properties as of 1930.
(11) 1952: A Geological Survey map of the Palo Verde Quadrangle dated 1952 shows that by then all of Tracts B, E, F, G and H, and part of Tracts A and D, were on the Arizona side of the river, the northern half of Tract C had reemerged on the California side, and all of the rest of the subject properties were submerged in the river, whose location had moved only moderately from its 1943 location.
(12) 1961: A dependent resurvey and accretion survey was performed in 1961 and published in 1962 by the Bureau of Land Management of the Department of the Interior covering T. 1 N., R. 24 W., G&SRM, in Arizona. This was the only official Government plat of survey embracing the properties in suit since the original survey in 1857 (finding 12(c) (1), supra), which latter described the lands to be in California (as they then were) and subject to the SBM coordinates. Until the extension of the G&SRM by the 1961 survey, no official overlap of the SBM and the G&SRM existed in plat form. The instructions to the surveying group in 1961 referred to the subject properties as patented lands shown to be in Arizona. Although this reference does not establish title status of the properties, it does reflect that at that time those in the Bureau of Land Management who prepared the instructions treated the subject properties as patented lands, as though they had not reverted to being public lands through past accretive changes. By 1961, as shown on the dependent resurvey of that year, all of Tracts B and F, and most of Tracts E, G, and H were on the Arizona side of the river, while the top third of Tract C was on the California side, and the balance of the property was submerged in the river.
(13) 1961¡,: An aerial photograph in 1964 shows the river in approximately the same position in relation to the properties as in 1961. It also shows a 1964 channelization project by the defendant, which in curving a connection between two legs in the loop of the river in order to shorten it, cut across Tracts G and H. The channelization project, which required *962 acquisition by the Government of 52 acres of the subject properties by condemnation for the token payment of $1 (see finding 18, infra), left the natural channel of the river loop still functioning with a reduced flow, and this latter area was dredged and improved by the Government for fish and wildlife recreational purposes. As of 1964 the bulk of the subject properties not submerged in the river or condemned for the channelization project lay in the island formed between the natural and artificial channels. By virtue of an interstate compact entered into in 1964 between Arizona and California (see finding 3, swpra) and ratified in 1966, all of the subject properties in the island thus formed lay in Arizona, for the agreed state boundary followed the thread of the natural channel of the river at that point, rather than the artificial channel.
13. (a) The defendant contends that all of the changes in the course of the Colorado River from 1857 to 1964, as described in finding 12, supra, were accretive and not avul-sive. The plaintiffs concur in this, except as to the change in location of the river which occurred 'between 1912 and 1914 (see pars, (c) (5) ¡and (6) of finding 12, supra), which change plaintiffs contend was avulsive in nature. The defendant’s contention as to the accretive nature of the 1912-14 change rests upon:
(1) The questionable authenticity of the 1912 Berg map, which has been discussed in finding 12(c) (5) ;
(2) The absence of tangible terrain evidence of a suddenly deserted 1902 (or 1912) channel (the theory being that in case of an avulsion, where the channel abruptly departs its location and a new channel is suddenly adopted, the banks of the old channel remain visible, whereas accretive channel changes leave no such souvenirs);
(3) A new channel of avulsive origins typically shortens the river at that point, whereas the 1914 channel claimed by plaintiffs to be avulsive in origin is longer than the allegedly deserted channel of 1912 ;
(4) The proof of homestead entries by Graham and Board, and/or their early experiences with flooded areas, indicates that the river covered much of their properties at relevant *963 times and no patents to land underneath the river could effectively convey title; and
(5) None of the homestead and patent applications identified land in Arizona.
(b) To which the plaintiffs respond that:
(1) many years during the high water period from May through July the river overflowed almost annually and inundated a wide area surrounding its channel;
(2) the proof filed by the homestead entrymen did not establish that at the time of their entries the river channel went through or upon the subject land;
(3) the avulsion was caused by extreme variations in the flow of the river, the topography of the area including sloughs, and the effect of defendant’s downstream dams.
(c) Finding 12 carefully traces the changes in the river channel in relation to the properties. A detailed study of the homestead entry file for each of the patents issued in this case produces certain conclusions relative to the accretion v. avulsion issue in the 1912-14 period. They are set out in the succeeding paragraphs of this finding.
(d) The frequent references in the homestead entry files to the flooding of the subject properties do not necessarily indicate that the properties were within the river channel. The properties were within the overflow area of the river, and the river commonly overflowed its natural levees during the annual high water season from May through July, but subsided thereafter. Such areas as were subjected to such periodic inundation were therefore patentable lands even if they could not safely be planted to crops. The farmers depended upon artificial levees to prevent flooding of their cultivated fields, but apparently the levees of the era were often inadequate for their protective purposes. That consideration may explain in part the relatively small portions of the patented lands which were used as cropland.
(e) (1) There are certain factual inconsistencies in the homestead entry files, so they are not deserving of complete reliance. For example, the Graham file contains affidavits as of June 1919 certifying the entire acreage to be cultivable, whereas paragraphs (c) (6) and (7) of finding 12 herein *964 report that large portions of Graham’s property were submerged in the river channel according to survey maps for 1914 and 1917, and hence probably not cultivable as of 1919. Whereas Graham’s homestead entry notice of May 2, 1914, made no mention of flooded lands, a survey map for 1914-shows substantial portions of the property to be submerged in the river channel, although the map is not given a precise date in 1914 and it is possible that it reflects a river position in 1914 taken subsequent to Graham’s homestead entry notice of May 2, 1914. Whereas Graham’s affidavit of July 1, 1920, states that in 1916 the river changed its course and put his land in the river so that he had to leave his land in June 1916 (elsewhere given in probable error as 1917), the official survey maps of the area for the years 1914 and 1917 do not reflect sharp changes in the river’s position between those years.
(2) The radical change in the position of the river vis-a-vis the subject property is reflected in the maps for 1912 and 1914 to have taken place within that period rather than in 1916, yet according to Graham’s notice of entry in May 1914 he had then taken possession of the land, which was ostensibly on the California side of the river and ostensibly susceptible to cultivation, at least in part, for he cleared and planted about 19 acres in 1914-15. Finally, the March 23, 1920, Favorable Report of the Special Agent for the General Land Office characterized the land as of that time to be “Overflow lands of Colorado River, covered with willows and various bushy growths,” which must be taken to refer to those portions of the land not occupied by the river.
(f) The Smith homestead entry file is more nearly consistent than the Graham file. It establishes that Smith built a house on his homestead land in April 1911, that in June 1912, he feared the levees would break so he left his property and was still absent as of August 30,1912, that as of August 30,1912, the entire property was covered with mesquite, cottonwood, and willows and was cultivable in its entirety, and that he had cleared and planted iy2 acres on Tract C in 1911-12. On the whole, Smith’s homestead entry file is consistent with his property lying well west of the river channel at the *965 time of his entry in May 1910 and clearly within California. Whether the shift of the river channel to cover the eastern half of his Tracts C and D according to the survey map of 1914 reflects a condition which existed at the time Smith’s patent was issued in February 1913 cannot be answered with any assurance, but because February 1913 preceded the normal flood season of 1913 it is reasonable to conclude that at the time the patent was issued the river occupied the position shown by the Berg 1912 map, which would place Smith’s Tracts C and D well west of the existing river channel. This conclusion is, of course, entirely dependent on the authenticity of the Berg 1912 map, but Smith’s statement in August 1912 that the land was entirely cultivable would support the correctness of the Berg 1912 map; and would contradict the defendant’s contention that by 1912 or so the river had achieved roughly the location shown in the 1914 map, which would place the river channel squarely across the eastern half of Smith’s Tracts C and D.
(g) In the case of Board’s homestead entry file for Tracts A and B, it is reported that he established residence there in March 1919, cleared and cultivated about 25% acres (most of which was on land adjoining on the west in section 14, and thus not part of the property in suit), and built a house in January 1923. While all of Board’s land was certified by himself and a witness in May 1923 to be cultivable, a sworn statement by another witness in May 1923 states that about 40 acres in Tract A was in the river at that time. That would be all of Tract A, although since May 1923 was during the annual high water period it is reasonable to conclude that about half of Tract A was in the river channel at that time and the rest was overflowed. This particular affiant (Zalkov-sky) expressed the fear that if something was not soon done to control the river, which was constantly moving its channel, “we may have no land whatever.” Significantly, throughout the homestead entry file Board’s property is referred to as being in California, and was similarly referred to in the patent issued to Board in August 1923. Actually, according to the survey map for 1923, the portion of Board’s Tracts A and B that were not submerged in the river were on the Cali *966 fornia side of the river. Just when the river channel encroached on Tracts A and B cannot be determined, but if the river accreted westward at a constant rate between 1917 (when it was not far from the eastern boundary of Tracts A and B) and 1923 (when it cut diagonally across Tracts A and B) then at the time Board first established residence there in March 1919 the right bank of the river would have been approximately at the eastern boundary of Tracts A and B.
(h) These analyses of the Graham, Smith and Board homestead entry files generally support the validity of the Berg 1912 map as to the location of the river at that time, and the plaintiff’s contention (with some exceptions) that the river channel had shifted suddenly by 1914 to the location shown in the survey map for that year and continued to move westward thereafter in an accretive fashion. Moreover, the difficulties experienced by the patentees in their farming efforts from 1910 onwards were principally due to the frequent overflows of the river during the annual high water seasons (largely unabated by an inadequate levee system) rather than encroachments of the river proper onto their properties because wherever the river shifted in those years there was left sufficient land outside the river for the modest areas of cultivation employed by the patentees. Regardless of the location of the shifting river channel vis-a-vis the subject properties the patentees and the authorities with whom they dealt from the time of their homestead entries until the issuance of their patents formally treated the lands thus entered and patented as being in California, even when they were physically on the Arizona side of the river.
(i) (1) It is also concluded that the general rules of river hydraulics applicable to unstable, alluvial streams such as the Colorado River are not immutable and in characterizing the changes in the river channel as either avulsive or accre-tive, the general rules are subject to exceptions. For instance, the absence of indicia of natural levees and a stream bed for an old channel from which the river avulted does not necessarily preclude the possibility of an avulsion between 1912 and 1914, since the existence of a high annual overflow of heavily sedimented flood waters for a period of several *967 months could well obliterate or blur plainly visible signs of the old channel. (Note: This last conclusion is that of the author, and is neither stated nor adequately refuted by the expert witnesses who appeared.) During the overflow period when vast expanses of the flood plain would be inundated it may have been difficult to determine the exact location of the river channel, and if, when the overflow subsided, the river current was flowing in a different channel it would be the normal consequence of water seeking its lowest level.
(2) The history of the river channel peregrinating in location over the wide expanse of the flood plain, and even at times beyond the flood plain natural levees to the bluffs on either side of the valley, would tend to support the theory that avulsive changes of the river were not uncommon, even if the pattern of accretive changes would be more normal. The record would not necessarily preclude the belief that the change in the position of the river channel from 1912 to 1914 was an avulsive change, even if it would violate a standard theory of river hydraulics that in an avulsive change the new channel always shortens the length of the river at that point, whereas the channel in 1914 was longer than the 1912 channel which it replaced. While there is no truly satisfactory explanation as to why or how between 1912 and 1914 the river avulted to a new channel which was longer than the one it replaced, the evidence provided by a comparison of the 1912 Berg map and the 1914 Clarke map establishes that this happened. Much rests upon the validity of the 1912 Berg map, but for the reasons given in finding 12(c) (5), supra, the challenge to it is on speculative grounds, and in balance not sufficient to overcome the reliance placed on the 1912 map in professional and judicial proceedings over a long period of years.
14. (a) (1) On the assumptions that (i) the sudden change in the course of the river channel from 1912, when it lay east of the subject properties, to 1914, when it ran vertically through the center of the properties, was an act of avulsion rather than a process of accretion, (ii) the changes in the location of the river channel after 1914 were accretive in nature (as the parties seem to agree), and (iii) without reference to certain other equitable and legal considerations *968 peculiar to this case, it tlhen becomes necessary to ascertain the consequences of the post-1914 accretive changes to the ownership of the subject properties, applying the traditional rules that avulsive changes do not affect title, that accretions and erosions result in gain or loss to the riparian owners as the ease may be, and that title to lands under navigable waters remains in the bordering states to the mean high water mark.[1]
(2) For the purposes of the analysis it will also be assumed that accretions and erosions affect riparian properties in horizontal planes, although the rule established in Johnston v. Jones, 66 U.S. (1 Black) 209, 223 (1861), is that the new frontage is to be proportioned along the new water boundary in the same ratio as the frontage of respective tracts along the old water boundary, which would not necessarily mean that the extensions or losses would be in strictly horizontal planes.[2] In applying the Johnston v. Jones formula, the lines of accretion are drawn from the extremes of each property perpendicular to the river.
(b) As of 1914 when the river avulted to a position flowing north and south through the center of the properties, the inchoate title to Tracts G and H would remain in Graham by virtue of his homestead entry in May 1914, the formal title to be perfected by the issuance of his patent in 1921. Graham’s title to the western portion of Tracts E and F remained, but ■the balance of Tracts E 'and F were submerged in the new channel of the river and were thus the property of the states. As of 1914 the title to Tracts C and D remained in Smith, to whom a patent had been issued in February 1913, except for those eastern portions of said tracts occupied in 1914 by the *969 avulted rirer channel. Tracts A and B remained public lands as of 1914, since they were not entered by Board until February 1919 and April 1920, respectively, and patented to him in August 1923.
(c) By 1917 the situation applicable to 1914 still applied, except that the broadening of the river during the intervening time had submerged most of Tracts C and D (Smith’s) and of Tracts E and F (Graham’s) and part of Tract G in the river, which submerged lands became the property of the bordering states, which respectively owned such submerged land to the thread of the stream.[3]
(d) By 1923 the continued westward movement of the river complicated the accretive consequences to respective titles, according to traditional application of the rules. Thus Tracts G and H had by 1923 gained by accretion the land due west thereof to the left bank of the river, which then cut diagonally through Tract E, whereby Graham reacquired title to that portion of the state-owned land .theretofore in the bed of the navigable river but exposed by the accretive move of the river westward. By 1923 Graham’s title to the eastern portion of Tract F riparian to the left bank of the river had been lost through accretion to the public land adjoining Tract F on the east. However Graham still had title to that small portion of Tract F lying on the right bank of the 1923 river channel. By the same reasoning, by 1923 Smith’s title to all of Tracts C and D had been lost, that which was submerged in the river by 1923 being owned by the states, and that which was by 1923 riparian to the left bank of the river having accreted to the public lands which in 1917 adjoined Tracts C and D on the east. By 1923 Board had lost to the states that portion of Tracts A and B then submerged in the river, but retained title to those portions of Tracts A and B riparian to the right bank of the 1923 river channel.
(e) The title situation in 1924 was approximately the same as that in 1923, with the exception that the broadening and slight change in location of the river by 1924 had added a had subtracted a small amount of land in the southeast cor-small amount of land to Tracts A and B by accretion, and *970 ner of Tracts E and G which Graham had owned in 1923 and which became submerged in the new 1924 river channel and had thus become the property of the states.
(f) The title situation in 1930 remained approximately the same as in 1924, except that by 1930 a radical thickening of the river had submerged almost all of Tract G, and a corner of Tract H, and left Graham with title to only small corners of Tracts F and G, and to almost all of Tract H.
(g) By 1942 a substantial alteration in the location and shape of the river reinstated Graham’s title to all of Tracts E, G and H, and gained him title by accretion to most of Tract B which by then had appeared on the left bank of the river, as well as a wedge of public land adjoining Tract F on the west. In this period Graham lost title to the comer of Tract F, which by 1942 was submerged in the river and was thus state property. By 1942 Board had lost title to Tract B, most of which had accreted to Graham, and the rest was in the river and was thus state property. As to Tract A, by 1942 Board’s title to most of it had accreted to public lands adjoining on the east (formerly Tracts C and D which had become public lands by 1923 as explained in paragraph (d) of this finding), while the rest of Tract A was submerged in the river and was state property. Thus in net, by 1942 the former titles of Board and Smith to Tracts A, B, C and D, and Graham’s title to Tract F, had been fully extinguished, and Graham had title to most of Tract B, and all of Tracts E, G andH.
(h) By 1962, interim changes in the river location since 1942 had increased Graham’s title to all of Tract B except the southwest comer thereof remaining in the river and being state property, but had reduced a small part of Graham’s land in Tracts G and H which had become submerged in the river and thus became state property. See diagram in opinion. It is to be noted that by 1962 Tract B had been enlarged by accretion thereto of public land separating Tract B from the left bank of the river. (No claim has ever been made to this accretion so far as the record indicates.)
(i) The situation in 1965 remained approximately the same as that described for 1962, except that by then the *971 Government bad condemned 52 acres of Graham’s property in Tracts G and H for a channelization program, leaving him possessed of Tract E in its entirety, all of Tract B except the southeast corner submerged in the river, and about 28 acres of Tract G. (Note: The names of the original patentees Graham, Smith and Board have been used throughout this analysis for purposes of convenience, without reference to the title transfers described in findings 16 and 17, infra.')
(j) The analysis of accretive title changes in paragraphs (a) through (i) of this finding are applicable whether the dates of homestead entries or dates of issuance of patents are considered. See United States v. 62.57 Acres of Land in Yuma County, Arizona, Fort Yuma Land and Investment, Inc., 449 F. 2d 5 (9th Cir.1971).
(k) Throughout this finding, and this report of facts as well, wherever property is referred to as being on the California or Arizona side of the river at various times, these references are equivalent to using the terms west or east of the river, respectively. This qualification is made because when the river avulted between 1912 and 1914 as described in findings 12 and 13, the avulsion did not disturb the old channel as being the state boundary between California and Arizona, so that the property enclosed between the old channel and the new channel remained in California despite being east of the river. This remained so until the confirmation in 1966 of the Arizona-California Compact described in finding 19, infra, which officially placed the properties in suit in Arizona.[4]
15. On January 31,1903, the Secretary of the Interior had caused an executive order to be entered withdrawing all the lands in Arizona lying within 6 miles of the Colorado River west of the 114th meridian from “settlement, entry or other form of disposition under the public land laws except the homestead laws,” which latter entries would be subject to the *972 limitations, etc., of 32 Stat. 388, Act of June 17,1902. The land on the Arizona side of the river was public domain and owned by the United States during and before the period from 1902 to the present time.
16. The parties agree that plaintiff Bechtel acquired certain of the properties in suit from one Palmer, and the rest from the Palo Verde Irrigation District through sales for nonpayment of taxes. The various conveyances in evidence provide an incomplete chain of title. However, it seems sufficiently clear that in January 1952 Tracts D, E, F, G and H were deeded to Bechtel from Palmer (or from Palmer’s Cibola Farms, Inc.) as then successor in interest to the original patentees for such tracts, and that in 1956 and 1959 Bechtel acquired quitclaim tax deeds to Tracts C and A, respectively, from the Palo Verde Irrigation District. All of the conveyances referred to the tracts as being located in California, were referenced to the San Bernardino meridian coordinates, and were recorded in the California land records rather than the Arizona land records. However Tracts E, F, G and H, having been first conveyed to Bechtel in 1952 by Palmer or his Cibola Farms, Inc., were for some undisclosed reason conveyed again to Bechtel in 1959, and on that occasion were recorded in the Arizona land records, even though they still described the tracts as being in California and referenced to the San Bernardino meridian coordinates. The physical location of the various tracts with reference to the position of the river at the various times of the conveyances to Bechtel is described in finding 12, supra.
17. Bechtel’s interest in the subject properties was sold and conveyed on January 31, 1964, to plaintiffs Wayne and Audrey Sprawls, and the sale agreement was recorded February 6, 1964, in the land records of Imperial County, California. On September 30, 1968, the Sprawls’ interest was conveyed by assignment agreement to plaintiff Wide River Farms, Inc. Plaintiffs and their predecessors in title have cleared and leveled the property in suit (except of course as to lands in the Colorado River), constructed irrigation ditches thereon, and improved and used said land for agricultural purposes. The lands have been used by plaintiffs and their *973 predecessors in title for agricultural purposes for in excess of 20 years. Prior to 1964 no claims bad been made to tbe lands adverse to the claims of the plaintiffs. Since the original issues of patents to the lands in suit the plaintiffs and those under whom they claim title have been in actual, peaceable and adverse possession of the property outside the bed of the Colorado River.
18. (a) On June 30, 1964, the United States filed a complaint in condemnation in the United States District Court for the District of Arizona (No. Civ. 5188-Phx.), and condemned 527.93 acres of land in the vicinity of the subject property, including 52 acres of Tracts G and H herein, for the purpose of a river channelization project which woidd connect the two legs of a bend in the river channel and redirect the flow of the river from its natural channel (at that time to the west), thus shortening the river at that point and causing almost all of the subject properties not actually in the old channel to lie between the latter and the new artificial channel. The relative positions of the old and new channels with respect to the subject property are described in finding 12(c) (13), supra, and in the sketch in the opinion preceding these findings. Paragraph 4 of the condemnation complaint alleges that the United States sought to acquire only adverse interest in the subject property, and that “such taking is without prejudice to the claim hereby made that the United States of America presently possesses the full fee simple title to said lands,” and that any of the present plaintiffs’ claim to ownership thereof was unfounded. Plaintiffs were awarded a token $1 as compensation for the 52 acres taken from Tracts G and H.
(b) The condemnation complaint is the first formal, positive statement in the record by the Government that it possessed the full fee simple title to the subject property, although the defendant’s Dependent Resurvey and Accretion Survey of 1962 shows the bulk of the property to have accreted to lands in Arizona east of the river, and they are referenced therein to the Gila & Salt River meridian coordinates. For many years prior to the 1961 survey referred to in finding 12(c) (2), supra, the Government had been un *974 certain of the ownership of many properties in the valley, and whether they were public lands or not, because there had been no official survey of these sections since 1857. Note, however (finding 16, supra), that plaintiffs must have had some misgivings as to title when in 1959 they recorded in Arizona the title to Tracts E, F, G and H.
19. In 1964, pursuant to the instructions of the California-Arizona Boundary Commission, a map was drawn showing the settlement proposed by the Commission of the Arizona-California boundary dispute. This map depicts the manner in which this dispute was settled as it affects the subject properties by the Interstate Compact defining the boundary between the states of Arizona and California executed on March 12, 1963, and approved by Congress on August 11, 1966 (80 Stat. 340). Through the establishment of points 14.05, 14.06, 14.07, 14.08 and 14.09, the boundary runs from east to west through a part of Tracts C and D, and then curves in a southeasterly direction at a point west of the subject properties. The Arizona-California Compact placed the land in question within the State of Arizona to the extent shown in the sketch in the opinion accompanying these findings.
20. The subject property was entered on the tax rolls of Imperial County, California, immediately following issuance of patents and remained on said tax rolls until part of said land was transferred to the Yuma County tax rolls on December 12, 1967, pursuant to the Arizona-California Boundary Compact (finding 10, supra). During all times since the patents issued, real property taxes have been paid to Imperial County, California, and/or Yuma County, Arizona.
21. Most of the subject property was included within the boundaries of the Palo Verde Irrigation District and was bonded for indebtedness incurred by said district in 1927; assessments have been paid on said lands since that date and are still being paid by plaintiff, Wide River Farms, Inc., despite the location of the property in Arizona.
22. Ownership by the United States of the subject land is not necessary to provide riparian frontage to other contiguous lands owned by the United States.

 until then the western boundary of Arizona where it adjoins California was the middle of the fluctuating main channel of the Colorado River. H.R. Doc. No. 113, 71st Cong., 1st Sess. (1929), at 233, being Geological Survey Bulletin 817, 2d ed., “Boundaries, Areas, Geographic Centers, and Altitudes of the united States and Several States.” H.R. Rep. No. 1734, July 19, 1966, accompanying 'S. 3249, 89th Cong., giving consent to the boundary compact, remarked that uncertainty of disputed boundaries between the two states at a number of locations because of channel changes had confused matters involving the civil and criminal jurisdiction of the two states and handicapped administration of public land programs.

 The bend was cut short by a channelization project in 1964 but, still receiving some river flow, was dredged and improved for fish, wildlife and recreational purposes.

 Finding 12, infra, describes the general system for surveying public land in the united States, with particular reference to the San Bernardino meridian in California, and the Gila & Salt River meridian in Arizona. These two meridians (commonly abbreviated SBM and G&SRM, respectively) and their referenced coordinates are applicable to this proceeding.

 Range 22 lay to the east oí range 21, which latter was the subject of the 1857 survey.

 Should the Congress as a result of this reference proceeding legislate a form of quitclaim relief to plaintiffs, the 52 acres of Tracts G and H condemned and used for the rechannellzatlon project are beyond recapture, and would require monetary recognition or satisfaction In hind.

 This addition of accreted public land has not been suggested by the plaintiffs’ brief, but It Is a necessary consequence of the accretive laws, which apply to both public and private land. However, the plaintiffs never exercised acts of ownership over this accreted public land, nor to this day have even claimed title to it.

 As pointed out In finding 14(a), injra, tie entire analysis of tlie accretive consequences to the ownership of the subject tracts is predicated on the assumption that accretions and erosions affect riparian properties In horizontal planes where the river runs from north to south, as here. Actually, as established In Johnston v. Jones, 66 U.S. (1 Black) 209; 223 (1861), inter alia, the rule Is that the new frontage Is to be proportioned among the riparian owners of the old frontage according to their shares of the latter, which would not necessarily mean that the sharing projections would be In strictly horizontal planes, but rather would be plotted In lines perpendicular to the wavy channel. This subject has not been raised by the parties, but must be considered If Congressional relief Is ultimately forthcoming.

 28 U.S.C. § 2410, which authorizes the private owner of property In which the Government claims a mortgage or other lien Interest to name the United States as a defendant in an action brought In a Federal district court or a state court having jurisdiction over the subject matter, does not include a situation where the United States has a title Interest as distinct from a Hen Interest. The United 'States has not consented to be sued by citizens to quiet title to property in which the Government claims a title Interest. Zager v. United States, 256 F. Supp. 396 (E.D. Wisc. 1966). To same effect under the predecessor statute to § 2410 see Wells v. Long, 162 F. 2d 842 (9th Cir.1947). Thus the plaintiffs may have a legal right to certain of the property In suit but, in the absence of a legal remedy against the Government, legislative relief would be their sole recourse. The right would be legal but the remedy would be equitable in the sense and procedure of 28 U.S.C. 5 2509.

 It will be recalled that in the case under consideration the 1914 avulsion placed a portion of California on the east side of the new channel, so to the extent the disputed properties were actually in this avulted piece of California at the time of patent issuance their description by reference to SBM coordinates was technically appropriate.

 Our record Infers that In the negotiations for the 1964 compact the California representatives unsuccessfully urged this in reliance on the 1912 Berg map.

 To follow the succeeding paragraphs of this finding It will be desirable to consult defendant’s exhibit 11, a set of map overlays, and to keep In mind the alphabetical designations arbitrarily assigned to the separate 40-acre tracts In the sketch incorporated In the opinion.

 Indicative of the difficulty Involved In determining the legal consequences to riparian land titles attending movements of the river, at page 3 of plaintiff’s exhibit 40, a memorandum of February 23, 1965, by the Lower Colorado River Land use Office, an agency of the Department of the Interior, it is stated: “The movements of the Colorado River have been frequent and extensive in this area. It is very difficult to ascertain from the survey records and maps exactly when the river moved and whether accretion or avulsion was involved. This area between the Yuma Valley levee and the river has been subjected to frequent submergence and re-emergence and consequently the legal aspects of these movements appear to be extremely complex.”

 To the extent that the thread of such a stream can be ascertained.

 As stated In House Report No. 1734 of July 19, 1966, accompanying S. 3249, 89th Cong., consenting to the Arizona-California Compact, theretofore the state boundary location had been in dispute for many years because of changes in the river channel, and the uncertainty had caused confusion, particularly as to land management and water development and regulation by the Department of the Interior.